# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00338-SCT

*IN THE MATTER OF THE ESTATE OF*
*DOROTHY JOHNSON, DECEASED, SHEILA*
*WEST AND JENNIFER PATZIUS, CO-*
*EXECUTRICES: SHEILA WEST, JENNIFER*
*PATZIUS AND JESSICA McALISTER*

*v.*

*RON JOHNSON, BRAD JOHNSON AND*
*MELANIE FOWLER*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/02/2015 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| TRIAL COURT ATTORNEYS: | B. SEAN AKINS |
| | JOE M. DAVIS |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | B. SEAN AKINS |
| ATTORNEY FOR APPELLEE: | JOE M. DAVIS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 12/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     This appeal stems from a judgment of the Tippah County Chancery Court to set aside *inter vivos* gifts made by Sheila West.

¶2.     Acting through a durable power of attorney granted by her mother, Dorothy Johnson, Sheila West removed her brother's, niece's, and nephew's names from certificates of deposit (CDs) originally created by Dorothy Johnson, and replaced them with her own name and the names of her two daughters. Sheila's brother, Ron Johnson, petitioned the chancery court to

set aside these amendments as an improper transfer of an *inter vivos* gift. Following a trial on the matter, the chancellor found that Sheila did not overcome a presumption of undue influence in making what amounted to *inter vivos* gifts and thereby reverted ownership of the CDs to their original form. This Court finds that, because Dorothy Johnson retained an ownership interest in all of the CDs at issue, neither the original conveyance nor Sheila's subsequent transfers can be considered *inter vivos* gifts. Therefore, we find that the chancellor erred in his analysis of the issue.

¶3. However, also at issue in this matter is whether Sheila West engaged in self-dealing under the durable power of attorney granted to her by Dorothy Johnson. While initially pleaded but not scrupulously argued by the parties, the reach of Sheila's power as Dorothy's attorney-in-fact was discussed during trial, creating a detailed record for this Court to review. Finding that Sheila failed to overcome the burden of undue influence created by the confidential relationship between herself and Dorothy, we affirm the chancellor's decision to revert the CDs to their status prior to Sheila's 2010 amendments.

## FACTS AND PROCEDURAL HISTORY

¶4. In February of 2005, Dorothy Johnson inherited a large sum of money following her sister's death. Dorothy used the money to make changes to her existing investments and created new certificates of deposit at the People's Bank in Ripley, Mississippi. In March 2005, Dorothy purchased a five-year CD (#092247) valued at $50,000. In May 2005, Dorothy purchased four additional five-year CDs. One CD was valued at $57,370.11, while the other CDs were each valued at $50,000. All five CDs were purchased as follows:

2

| Number | Owners | Value |
|--------|--------|-------|
| #092247 | in the name of "Dorothy Johnson or Jennifer Patzius or Melanie Fowler." | $50,000 |
| #092553 | in the name of "Dorothy Johnson or Sheila West or Ronny Johnson" | $57,370.11 |
| #092554 | in the name of "Dorothy Johnson or Brad Johnson or Jessica McAlister" | $50,000 |
| #092555 | in the name of "Dorothy Johnson or Melanie Fowler or Jennifer Patzius" | $50,000 |
| #092556 | in the name of "Dorothy Johnson or Brad Johnson or Jessica McAlister" | $50,000 |

¶5.     On July 13, 2005, Dorothy privately met with an attorney who prepared her last will and testament and a durable power of attorney. Within the language of both documents, Dorothy ensured her investments were protected and that they would be distributed upon her death according to her specified beneficiaries. During the meeting, Dorothy assigned the power of attorney to her daughter Sheila but did not immediately deliver it.

¶6.     Five years later, in the spring of 2010, Dorothy's health began to decline. Although sound of mind, Dorothy became bedridden and unable to perform routine tasks. At that time, Sheila was living with her mother and had assumed most of the responsibilities around the home. When Dorothy became more dependent on her daughter, she delivered the power of attorney to Sheila, making it easier for her to manage the day-to-day caregiving.

¶7.     That same spring, the five CDs at issue matured. On August 23, 2010, Sheila visited People's Bank and used her authority as holder of Dorothy's power of attorney to effect changes to each of the above-mentioned CDs. Sheila's changes were as follows:

| 2005 No. | 2005 Owners | VALUE | 2010 No. | 2010 Owners |
|---|---|---|---|---|
| #092247 | in the name of "Dorothy Johnson or Jennifer Patzius or Melanie Fowler" | $50,000 | #99869 | in the name of "Dorothy Johnson or Sheila West or Jennifer Patzius" |
| #092553 | in the name of "Dorothy Johnson or Sheila West or Ronny Johnson" | $57,370.11 | #99870 | in the name of "Dorothy Johnson or Sheila West or Jennifer Patzius" |
| #092554 | in the name of "Dorothy Johnson or Brad Johnson or Jessica McAlister" | $50,000 | #99867 | in the name of "Dorothy Johnson or Jessica McAlister or Sheila West" |
| #092555 | in the name of "Dorothy Johnson or Melanie Fowler or Jennifer Patzius" | $50,000 | #99868 | in the name of "Dorothy Johnson or Sheila West or Jennifer Patzius" |
| #092556 | in the name of "Dorothy Johnson or Brad Johnson or Jessica McAlister" | $50,000 | #99866 | in the name of "Dorothy Johnson or Sheila West or Jessica McAlister" |

¶8.    Dorothy died on October 14, 2010, and the petition for probate of last will and testament was filed one month later.  Claiming that the will did not "represent Dorothy's intentions," Ron Johnson–Dorothy's son and Sheila's brother–filed a petition to contest the validity of the will being probated on February 22, 2011.

¶9.    During discovery, Ron learned of the CDs and the changes Sheila had made.  He also discovered that the CDs were kept in Dorothy's bank lock box, to which only Dorothy, Sheila, and Sheila's daughters–Jennifer Patzius and Jessica McAlister–had access.   While Ron and his children originally were listed on them, neither Ron, Melanie Fowler (his

4

daughter) nor Brad Johnson (his son) viewed or had access to the certificates at any point. Ron testified that, prior to his petition, he was aware of the CDs and the fact that he and his children were listed on some of them as owners, but neither he nor his children were aware of the structure, maturity rate, or amount of each certificate.

¶10. Ron recognized that, although they were referenced in the will, the CDs were not assets of the estate. As a result, he abandoned his petition contesting the validity of the will and instead filed a petition against Sheila and Jennifer to set aside *inter vivos* gifts. He later amended the petition to include Sheila's daughter, Jessica McAlister, as a respondent, and to join his children as petitioners.

¶11. Trial was held on June 25, 2015, during which the chancellor found that Sheila and her daughters had failed to present any evidence to overcome a presumption of undue influence. Thereafter, the chancellor set aside the changes to the CDs as improper amendments to an *inter vivos* gift and ordered them be returned to their original 2005 form of ownership. He then required they be distributed in equal shares pursuant to that ownership, and in accordance with Item IV of Dorothy's will, which stated:

> I own six Certificates of Deposit, each of which contain my name and two other names. I desire that those Certificates of Deposit be divided equally, share and share alike, between the signatories listed on each of those Certificates of Deposit.

Aggrieved, Sheila and her daughters filed a Rule 59 motion to amend the judgment or, in the alternative, for new trial. The court denied the motion.

¶12. On December 23, 2015, Sheila and her daughters timely filed a notice of appeal. On February 18, 2016, the chancellor signed an order which, once entered, provided the

appellants five days to post a supersedeas bond in the amount of $160,856.32. Understanding that, regardless of the appeal's outcome, she and her daughters would receive at least half of the recognized CD values ($128,685.05 to be divided among the three of them), Sheila requested that their half of the CDs in dispute be used as collateral for the bond. The chancellor rejected Sheila's collateral assignment and insisted the bond be posted in cash by March 4, 2016. Sheila and her daughters failed to post the bond and the chancellor required that his original order be carried out, disbursing the CDs, as directed in their 2005 form.

¶13.    Sheila and her daughters now petition this Court, raising issues concerning *inter vivos* gifts, the appropriate burden of proof, the distribution of the CDs and the supersedeas bond requirements.  We find that the case hinges on the questions of (1) whether the transfers in 2005 and 2010 can be considered *inter vivos* gifts and (2) whether Sheila abused her authority under the power of attorney by removing Ron, Brad, and Melanie from the original CDs and replacing their names with Jennifer, Jessica, and herself.  Additionally, we address the question raised by the appellants regarding whether the chancellor abused his discretion by failing to approve a supersedeas bond as requested by Sheila and her daughters, and thereafter ordering the immediate distribution of the certificates of deposit.  Finding that Sheila had exceeded the scope of the power of attorney and that the chancellor properly reverted the CDs to their original form, distributing them according to Dorothy's will, we affirm the chancellor's judgment.

## STANDARD OF REVIEW

¶14. This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *Sanderson v. Sanderson*, 824 So. 2d 623, 625–26 (Miss. 2002). Likewise, we will not reverse the chancellor's decision if his findings are considerably supported by evidence in the record. *Wright v. Roberts*, 797 So. 2d 992, 997 (Miss. 2001). We employ the de novo standard when reviewing questions of law. *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719, 721 (Miss. 2002).

## DISCUSSION

### I. *Inter Vivos Gifts*

¶15. In his chancery court petition, Ron claimed Sheila improperly used the power of attorney to withdraw the principal and interest from each of the five CDs and create new CDs naming a combination of Dorothy, Sheila, Jennifer, and Jessica as owners. Ron argues that Sheila–acting under her mother's name–created an *inter vivos* gift to herself and her daughters, thereby appropriating funds belonging to Ron, Brad, and Melanie. He echoes this argument in his brief before the Court, elaborating on the claim and indicating that Sheila did not carry her burden to prove that this *inter vivos* gift was valid. However, we need not address the validity of the gift, as we find that no gift was made under the law.

¶16. It is well-settled that to show that an *inter vivos* gift was given, a party must prove five elements by clear and convincing evidence:

(1) that the donor was competent to make a gift;
(2) that the donation was a voluntary act and the donor had donative intent;
(3) that the gift must be complete and not conditional;
(4) that delivery was made; and

7

(5) that the gift was irrevocable.

*In re Estate of Laughter*, 23 So. 3d 1055, 1066 (Miss. 2009) (citing *In re Estate of Ladner*, 909 So. 2d 1051, 1054 (Miss. 2004)). However, we also recognize that "[d]elivery and relinquishment of control are requisites of an *inter vivos* gift." *In re Estate of Laughter*, 23 So. 3d at 1066. Delivery–either actual or constructive–is an essential element to an *inter vivos* gift's validity. *Thomas v. Eubanks' Estate*, 358 So. 2d 709, 713 (Miss. 1978). Arguably, the foundational element of a valid *inter vivos* gift is its *unconditional* delivery, "in such manner that the donor retains no control or dominion over it." *In re Estate of Laughter*, 23 So. 3d at 1055.

¶17. Chief Justice Whitfield observed in 1901 that, as it relates to *inter vivos* gifts, "[c]onveying all is evidence of absence of hope of recovery, but also evidence that because of it, the party means the gift to take effect at once, unconditionally and irrevocably." *Wilson v. Jourdan*, 29 So. 823, 824 (Miss. 1901). Eighty-five years later, we reiterated that rule, noting that an *inter vivos* gift cannot be revocable or conditional. *See Carter v. State Mut. Fed. Sav. & Loan Ass'n*, 498 So. 2d 324, 327 (Miss. 1986). There must be delivery of the property and the donor must surrender all dominion over it. *Id.* (*see also Gidden v. Gidden*, 167 So. 785, 790 (1936), and *Yates' Estate v. Alabama-Mississippi Conference Ass'n of Seventh-Day Adventists*, 176 So. 534 (Miss. 1937)).

¶18. While Dorothy listed herself along with two additional names on the CDs in 2005, and Sheila then changed those CDs to include Dorothy and two different names in 2010, at no point did Dorothy relinquish her control or dominion over the CDs to the other two owners.

Rather, each party became a co-owner of the respective CDs. Whenever a CD is titled in the names of two or more persons, payable to any of the persons named, it is presumed that those persons are owners of the account. *In re Last Will and Testament and Estate of Dunn v. Reilly*, 784 So. 2d 935, 942 (Miss. 2001) (citing *Madden v. Rhodes,* 626 So. 2d 608, 616 (Miss.1993)). Each "depositor" is then able to treat the joint property as if it were entirely his own. *Drummonds v. Drummonds,* 156 So. 2d 819, 821 (1963)). As a result, any individual owner–including Dorothy–had the authority to withdraw funds, liquidate, or reinvest any of their respective CDs at any time.

¶19. This rule is outlined in Mississippi Code Section 81-5-63, which provides in pertinent part that:

> When a deposit has been made or is hereafter made in the name of two (2) or more persons, . . . the deposit or any part thereof or interest or dividends thereon may be paid to any one (1) of those persons, without liability whether one or more of those persons is living or not, and the receipt of acquittance of the person so paid shall be a valid and sufficient release and discharge to the bank for any payment so made. The making of a deposit in that form, or the making of additions thereto, shall create a presumption in any action or proceeding to which either the bank or any survivor is a party of the intention of all the persons named on the deposit to vest title to the deposit and the additions thereto and all interest or dividends thereon in the survivor or survivors.

Miss. Code Ann. § 81-5-63 (Rev. 2015). The Mississippi Court of Appeals has expertly explained that this section allows for deposits in the name of two or more persons to be withdrawn by just one of the named parties without the bank incurring liability. *See DeJean v. DeJean*, 982 So. 2d 443, 449 (Miss. Ct. App. 2007). Similar to the deposits in *Dejean*, the 2005 and 2010 CDs at issue were owned jointly by Dorothy and a combination of her

children and grandchildren. This joint ownership allowed any named owner to withdraw the funds at any time. *Id.*

¶20. Because Dorothy maintained her status as a CD owner, Sheila's transfer did not create an *inter vivos* gift. With the record clearly showing that Dorothy retained control and dominion over the CDs to the extent that she could remove them from the safe-deposit box and cash them out at any time, we cannot say that either she or Sheila effected a valid *inter vivos* gift through the creation of the CDs or the 2010 transfers of ownership. *Moore v. Moore*, 363 So. 2d 286, 288 (Miss. 1978). We therefore find Ron's argument that Sheila made an *inter vivos* gift to herself and her daughters unsupported by the applicable law.

## II. Durable Power of Attorney

¶21. Whether Sheila abused her authority under the power of attorney by removing Ron, Brad, and Melanie from the original CDs and replacing their names with Jennifer, Jessica, and herself, remains an issue before this Court. Though not persistently argued, Ron and his children alleged early on that Sheila violated her fiduciary duty as holder of Dorothy's power of attorney by appropriating funds through the CD transfers, contrary to Dorothy's wishes and instructions. Throughout this litigation, the focus remained on the improper *inter vivos* gifts, permitting the parties to present evidence supporting or defending against a finding of a confidential relationship, undue influence, and abuse of authority. Although the chancellor did not approach this issue head-on, the record is replete with evidence and testimony addressing the matter. We recognize our "obligation to affirm a trial court judgment correct as a matter of law, even though the trial court may have been mistaken in its reason for

10

granting the judgment." ***Shewbrooks v. A.C.&S. Inc.,*** 529 So. 2d 557, 564 (Miss. 1988)

*superseded by statute on other grounds as stated in **N. Am. Midway Entm't, LLC v. Murray***,

200 So. 3d 437, 439 n.4 (Miss. 2016). Today, we scrupulously review the record evidence

to determine if such was the case in this matter.[1]

### A. *Creation and Delivery of the Durable Power of Attorney*

¶22. A durable power of attorney is a written document through which an individual (the

"principal") gives another person (the "agent") the authority to act for the principal in

accordance with the terms and conditions specified in the document. The connection between

principal and agent is a particular type of agency relationship that is governed by the statutory

requirements set forth in Title 87, Chapter 3 of the Mississippi Code. As with other

principal-agent relationships, the party trusted with the responsibility in the power of attorney

owes certain duties to the principal. *See **In re Estate of Hemphill***, 186 So. 3d 920, 933

(Miss. Ct. App. 2016) (citing *Restatement (Third) of Agency* § 8.07 (2006) ("An agent has

a duty to act in accordance with the express and implied terms of any contract between the

agent and the principal.")). The principal must perform all duties designated in the contract

consistently with her role as a fiduciary.

---

[1] While we appreciate the merits of Justice Coleman's dissent, and the important distinction between the roles of the trial courts and the appellate courts, our review of the record and transcript before us provides the Court with the information necessary to affirm the chancellor's decision. The chancellor reviewed arguments by the parties, making on-the-record remarks about the circumstances before him, and determined that Sheila had failed to rebut the presumption of undue influence created by the confidential fiduciary relationship she shared with her mother. (*Infra* ¶ 32). The analysis in paragraphs 33 through 48 includes our review of this information and confirms as much.

¶23. Where the power of attorney authorizes the attorney-in-fact to sign "financial instruments, contracts, or documents" relating to personal property and to perform any act that ought to be done, changing the beneficiary on a CD is implicitly covered as a type of financial instrument.[2] However, this broad authority does not permit the attorney-in-fact to engage in undisclosed, self-dealing activities. "It is fundamental law that an agent owes his principal absolute good faith and fidelity, and he cannot in the exercise of his authority as agent acquire property or interest therein rightfully belonging to his principal without full disclosure and free consent of his principal." *McKinney v. King*, 498 So. 2d 387, 388 (Miss. 1986). If disputed, the attorney-in-fact's actions must be shown to be within the principal's intent when granting the power of attorney, in the best interests and for the benefit of the principal, and in accord with the duty of good faith owed by the attorney-in-fact to the principal. Any property or interest obtained in violation of the attorney-in-fact's fiduciary duty "thereby is voidable by, and may be set aside by the principal or his estate." *Id.*

¶24. In 2005, when of sound mind and physical ability, Dorothy created the power of attorney and drafted her will. Dorothy's choice to appoint Sheila as her attorney-in-fact was a natural choice: at the time, Sheila already had assumed the role of "caretaker" in the family and was heavily involved in the care and support of her parents. Notably, in 2001, Sheila left

---

[2] A certificate of deposit is considered a note of the bank. It is "an instrument containing an acknowledgment by a bank that a sum of money has been received by the bank and a promise by the bank to repay the sum of money." Miss. Code Ann. § 75-3-104(j) (Rev. 2016). The terms and provisions of the CD create a contract, which "determines the manner in which the funds of the depositor may be withdrawn and is subject to the law of contracts." *Epperson v. SOUTHBank,* 93 So. 3d 10, 16 (Miss. 2012).

12

her job to care for her ailing father. When her father passed away, Sheila remarried but faithfully visited Dorothy every day after work. As Dorothy's health began to decline, Sheila resumed her role as caregiver, eventually moving into her mother's home to ensure Dorothy was cared for around the clock. Although a nurse frequently visited to monitor Dorothy's medical needs, Sheila assumed primary responsibility for Dorothy's day-to-day care until her death in 2010.

¶25. Through the witness testimony and other evidence, the record shows that at the time the changes in the CDs were made–August 23, 2010–Sheila was both Dorothy's caregiver and her attorney-in-fact. Because the durable power of attorney was created in July 2005 and not delivered until Dorothy's health declined in May 2010, the parties do not dispute its validity. Sheila was properly tasked with managing Dorothy's business and legal affairs, which she dutifully executed. However, she managed her responsibilities to Dorothy without using the authority provided by the power of attorney until August 2010, when she employed the power to changed ownership of the CDs.

¶26. The lower court recognized that the validity of the power of attorney is undisputed. However, omitted from the discussion was whether the powers delivered to Sheila in 2010 provided her with the authority to remove Ron and his children from the CDs without evidence of Dorothy's intent to do so. The power of attorney provided Sheila with the following pertinent powers:

> (1) To have broad and discretionary powers in handling my business affairs, including the receipt and deposit . . . investments that I might have.

13

(2) To sign and execute all financial or other legal documents for and on my behalf, including, but not limited to . . . drafts or other securities and deposits of all proceeds and receipts from all investments and income in my name in any banking institution in the United States, including the State of Mississippi. . . .

( 4) To enter into my lock box at any time and to deposit and take therefrom any papers or valuables which I might have.

Unlike other powers of attorney this Court previously has ruled upon, Dorothy's appointment did not include a provision for gifts. Nor did the document include a self-dealing clause, prohibiting or providing for the receipt of property or funds by the attorney-in-fact. Because the document is silent on both, we review the CD revisions under Mississippi Code Section 81-5-63, which provides that "the creation of a certificate of deposit creates an automatic presumption of 'intent' to give ownership to the persons named on the CD, whether living or as survivors. Such presumptive title may be defeated upon proof of forgery, fraud, duress, or . . . [the] unrebutted presumption of undue influence." *Foster v. Ross*, 804 So. 2d 1018, 1022 (Miss. 2002). We therefore begin our analysis by determining whether Ron created the presumption of undue influence by proving the existence of a confidential relationship between Sheila and Dorothy after the durable power of attorney was delivered. We then evaluate whether any confidential relationship affected Sheila's execution of the power of attorney and whether she rebutted the presumption of undue influence.

### B. *Confidential Relationship*

¶27. "This Court has held in numerous cases that the burden of establishing the existence of a confidential relationship is upon the party asserting it." *Norris v. Norris*, 498 So. 2d 809, 813 (Miss. 1986). As previously recognized, the parties did not dispute the validity of

Dorothy's power of attorney: it was created in 2005, prior to Dorothy's health issues, and was drafted without Sheila's knowledge or influence. The parties further agree that Sheila voluntarily chose to provide care for Dorothy in her final months, without knowledge of the power of attorney or content of the will. Finally, the record indicates that the power of attorney was delivered to Sheila without coercion and out of necessity as Dorothy's health began to decline. While in other jurisdictions, the presence of a valid power of attorney, alone, serves to create a confidential relationship between the principal and agent, in Mississippi, "the existence of a power of attorney is but one factor to consider in determining whether a confidential relationship exists." *Matter of Estate of Grantham*, 609 So. 2d 1220, 1223–24 (Miss. 1992) (citing *Costello v. Hall*, 506 So. 2d 293, 297 (Miss.1987)). Therefore, we look to the record to determine if Ron proved the existence of a confidential relationship by clear and convincing evidence.

¶28. Following her father's death and through the spring of 2010, Sheila visited her mother regularly. With Sheila's daughter Jennifer living next door, the three generations of Johnson women would frequently see one another, often having daily conversations. As Dorothy's health declined, Sheila initially visited her mother daily after work but eventually quit her job and moved in with Dorothy to provide twenty-four-hour-care. Jessica and Jennifer would visit often, and the three women testified that, through their interactions with Dorothy, she remained alert, perceptive, and coherent during her final months.

¶29. We strongly adhere to the holding "that a confidential relationship is not confined to any specific association of persons but arises any time there appears on the one side an

15

overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed." ***Norris v. Norris***, 498 So. 2d 809, 812 (Miss. 1986). In ***Costello v. Hall****,* we refused the conclusion that "a power of attorney, in itself, creates a confidential relationship. . . as a matter of law." ***Costello v. Hall****,* 506 So. 2d 293, 297 (Miss. 1987). We determined more evidence must be established regarding the relationship in question before the presumption of undue influence could be raised. *Id.* More recently, we reaffirmed ***Costello****,* holding that, "[t]he person who allegedly is taking advantage of the confidential relationship '. . . must have used that relationship for his personal gain or to thwart the intent of the testator.' " ***Kimbrough v. Estate of Kimbrough***, 134 So. 3d 281, 285 (Miss. 2014) (citing ***Costello***, 506 So. 2d at 298). In addition to holding the power of attorney, the agent must exert influential control over the dependent principal, to the point of unmistakable reliance. *See* ***Murray v. Laird***, 446 So. 2d 575 (Miss. 1984).

¶30. Although the tight bond a daughter and mother inherently share is not enough to make such a relationship "confidential," the care and attention Sheila provided Dorothy engendered a specific sort of reliance and trust which can only be considered to be influential. The parties described the relationship between Dorothy, Sheila, and her daughters in detail, through their pleadings and their testimony at trial. The record provides that, prior to her final months, Dorothy frequently looked after Sheila by giving her moderate to large sums of money. Because Sheila had gone through a divorce and then lost her second husband to a devastating brain hemorrhage, Dorothy was concerned for Sheila's financial well-being. Sheila suffered from migraines and struggled to maintain steady employment, making it

16

nearly impossible for her to make ends meet. Sheila testified that her mother was aware of her financial difficulties at the various stages of her life, and would give her money for bills and other necessities as needed. She stated that she depended on her mother and relied on her for financial help with any bills she could not cover. In fact, the court acknowledged that "Sheila and her two daughters are poor, poor, poor, they need money; they need help; and Sheila's mother helped them."

¶31. In return, Sheila was very close with her mother. Linda Hawks–Dorothy's niece–described Sheila as a "constant presence" in Dorothy's life, contacting her daily, and visiting her several times a week.[3] Through the testimony provided, the chancellor recognized that Sheila had established a close bond with her mother that neither her brother Ron nor the other grandchildren had developed with Dorothy. That close bond continued throughout the later months of Dorothy's life as Sheila continued to be a constant presence in her life, moving into her home, providing continuous care, monitoring her medical needs, and ensuring her comfort.

¶32. "Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of the mind or body, or through trust, the law

---

[3] Testimony was given as to the extent of Dorothy's relationship with Jennifer and Jessica as well. This testimony–while not directly relevant to Sheila's relationship with Dorothy–provides support for Dorothy's propensity for generous gift-giving. Sheila testified that Dorothy and her husband helped her daughters though college and paid for both Jennifer's and Jessica's weddings. While the daughters did not depend on Dorothy financially, the testimony indicates that they received substantial gifts from their grandmother.

does not hesitate to characterize such a relationship as fiduciary in character. *Foster v. Ross*, 804 So. 2d 1018, 1022-23 (Miss. 2002) (citing *Madden v. Rhodes*, 626 So. 2d at 617 (Miss. 1993)). A moral, personal, or domestic relationship, which would impose the duties of a fiduciary also will be considered confidential under the appropriate circumstances. *Mullins v. Ratcliff*, 515 So. 2d 1183, 1191 (Miss. 1987). Although the chancellor analyzed whether Sheila and her daughters shared a confidential relationship with Dorothy as it related to the apparent creation of *inter vivos* gifts, the analysis for the relationship Sheila shared with Dorothy when she exceeded the scope of the power of attorney is the same. The court found that, in addition to delivering the power of attorney to Sheila, Dorothy was bedridden and reliant upon Sheila for her basic needs. Applying the above-quoted standards, we find that Dorothy relied upon, depended on, and trusted Sheila, creating a confidential, fiduciary relationship between Sheila and Dorothy, thereby raising a presumption of undue influence. We now turn to the record to determine whether Sheila successfully rebutted this presumption through clear and convincing evidence.

### C. Undue Influence

¶33. Before we engage in the applicable analysis, we must acknowledge that the mere presence of a confidential relationship does not, in and of itself, create the presumption of undue influence. Rather, something more is required. *See In re Will of Adams; Simm v. Adams*, 529 So. 2d 611, 615 (Miss.1988). The basis of this rule is that there must be some showing that the agent abused "the relationship either by asserting dominance over the [principal] or by substituting her intent for that of [the grantor]." *Id.* Here, we have a

18

confidential relationship between a daughter/caretaker/holder of power of attorney and her mother. We find the record indicates the use and possible abuse of said confidential relationship/power of attorney to procure and execute transfers of certificates of deposit for the benefit of the attorney-in-fact and her daughters, suggesting that Sheila substituted her intent for Dorothy's. We need not explore this analysis any further.

¶34.    Having established that a confidential relationship existed and that Sheila–the beneficiary–potentially abused this relationship,"a presumption of undue influence arises which may be rebutted only upon proof by the grantee/beneficiary arising to the dignity of clear and convincing evidence." *Norris v. Norris*, 498 So. 2d 809, 813 (Miss. 1986) (citing *Kelly v. Shoemake*, 460 So. 2d 811, 819-20 (Miss. 1984)).   In *Matter of Will of Wasson*, this Court discussed undue influence at length. There, we determined that "undue influence is the substitution of the will and intent of the beneficiary for that of the testator." *Matter of Will of Wasson*, 562 So. 2d 74, 79 (Miss. 1990).  The Court continued that "the 'polestar consideration' in our review of a will contest [is] to give effect to the intent of the testator." *Id.* (citing *Tinnin v. First Bank of Mississippi,* 502 So. 2d 659 (Miss. 1987)).   In matters like those we review today, "the effect of a charge of undue influence is to suggest" that the changes to the CDs reflect the intent of the beneficiary (i.e., Sheila and her daughters) and not that of the testator.  *Id.*  The effect of such changes results in the "substitution of another's will for the will of the [grantor]." *Barnett v. Barnett*, 124 So. 498, 500 (Miss. 1929).

¶35.    As we determined in **Wasson**, we continue to recognize that those cases which raise "the presumption of undue influence present factual scenarios where there was more than just a legal or domestic relationship between the testator and the beneficiary." **Costello v. Hall**, 506 So. 2d 293, 297–98 (Miss. 1987).  There must also be an abuse of that relationship in which  the beneficiary used that relationship for her "personal gain or to thwart the intent of testator." **Id.**  "Suspicious circumstances, along with the confidential relationship, [will] also give rise to a presumption of undue influence." **Matter of Will of Fankboner**, 638 So. 2d 493, 495 (Miss. 1994).  Here, we find the presumption established in that the confidential relationship existed and Sheila's use of the power of attorney to amend the CDs was both suspicious and resulted in personal gain for herself and her daughters.

¶36.    Once established, this Court employs a three-pronged test to determine whether the presumption of undue influence has been successfully rebutted.  First, we review whether the grantee/beneficiary acted in good faith.  Next we determine if the grantor had full knowledge and deliberation of his actions and the consequences of those actions.  Finally, we consider whether the grantor exhibited independent consent and action through the advice of a competent person, disconnected from the grantee and wholly devoted to the grantor/testator's interest.  **Murray v. Laird**, 446 So. 2d 575, 578 (Miss. 1984).  The defending party must prove each of these by clear and convincing evidence to rebut the presumption. **Id.**

1. Good Faith

¶37. The Court in *Murray v. Laird* outlined the elements of the good-faith test through five factors, each "to be considered as significant to overcome the inference of the presumption." *Id.*

> (1) the identity of the initiating party in seeking preparation of the instrument;
> (2) the place of the execution of the instrument and in whose presence;
> (3) the consideration and fees paid, if any;
> (4) by whom they were paid; and
> (5) the secrecy and openness of the execution of the instrument.

*Id.* Therein, the court acknowledged that–while not required–the grantee/attorney-in-fact's disclosure of intent made prior to the transfer of property "helps dilute the undue influence presumption." *Murray*, 446 So. 2d at 579.

¶38. Applying these factors to the case at hand, Sheila failed to show that her use of the power of attorney to amend the certificates of deposit met the elements of "good faith." First, Sheila admits she changed the owners of the CDs using the power of attorney, as if she were Dorothy making the changes herself. Sheila stood in the shoes of Dorothy when she executed the transfers, signing Dorothy's name and using Dorothy's Social Security number for identification. In defense of her actions, Sheila admits that if she or her daughters wanted to amend the certificates, they all could have entered the lock box at any time and changed their names on the respective CDs. However, rather than effecting the changes through their own signatures, Sheila used the power of attorney and initiated the transfers through Dorothy's name. The independent authority on which Sheila relies is of no moment.

¶39. Additionally, the changes to the CDs–whether approved or not–seem to have been made in secrecy without disclosure to any of the other named parties. Sheila claims that the

amendments were made pursuant to Dorothy's direction and that, prior to Sheila's trip to the bank, Dorothy called her People's Bank consultant–Eugenia Parson–to discuss the transfers. Furthermore, Sheila testified that Dorothy had been unhappy with the structure of the CDs since 2005 but could not make the changes until 2010 when they matured. Sheila asserts that by the time they matured, Dorothy could not make these changes herself, so she asked that Sheila transfer their ownership using the recently-delivered power of attorney.

¶40. Nothing more than Sheila's testimony was provided to support these claims. Eugenia Parson passed away prior to trial and was unable to corroborate Dorothy's intentions. Sheila's attorneys failed to arrange testimony from any other employee at the bank, and no evidence or testimony regarding the transaction at the bank, no conversations which took place, nor any identifying information regarding Dorothy's intent, was provided. No evidence was presented documenting Dorothy's unhappiness with the structure of the CDs, and–other than Jennifer's testimony regarding her employment at People's Bank and the bank's policies on withdrawing CD funds prematurely[4]–no information was provided regarding the penalties Dorothy would have provoked had she transferred the ownership sooner. Finally, when prompted, Sheila admitted that she had discussed the transfers with

---

[4] Jennifer testified that she had worked at People's Bank for seven years. In that time, she worked in "New Accounts" handling CDs and their renewals. She worked directly with Parsons and testified to her work history and experience. Jennifer testified that CD holders could not change their investments prior to maturity without incurring a penalty, unless the bank authorized such an amendment. After some questioning from the court, it was determined the bank could make such an adjustment, at its discretion, but the client may not be able to keep her interest rate.

Dorothy and Jennifer but gave no notice to Ron or his children. The only individuals providing any evidence of Dorothy's intent appear to be those who benefit directly from it.

¶41. Finding that Sheila did not meet the necessary factors in the Court's good-faith analysis, she failed to rebut the presumption on this prong. However, we continue with the analysis in the spirit of being thorough.

2. Knowledge

¶42. We have established four necessary factors to address the grantor's knowledge, at the time of execution of any instrument. These guidelines "suggest that the [] grantor should give a thoughtful deliberation to all of these factors. No set amount of time is . . . required, but a positive factor to overcome the undue influence presumption is a mature and thoughtful weighing of the legal consequences of a grantor's[] action." *Murray*, 446 So. 2d at 579. The factors we consider are

(a) the grantor's awareness of her total assets and their general value,

(b) her understanding of the persons who would be the natural inheritors of her bounty under the laws of descent and distribution or under a prior will, and how the proposed change would legally affect that prior will or natural distribution,

(c) whether nonrelative beneficiaries would be excluded or included and,

(d) knowledge of who controls her finances and business and by what method, and if controlled by another, how dependent is the grantor[]on her and how susceptible to her influence.

*Id.* Addressing the first factor, ample testimony and evidence was provided indicating that Dorothy remained in full control of her finances through her final days. She was a sharp woman and a keen investor, who kept in constant contact with her representatives at

23

People's Bank. Witnesses testified that she frequently shopped interest rates and checked her balances to ensure her money was working for her. She undoubtedly was fully aware of her total assets and their general value at the time Sheila effected the transfers.

¶43. Likewise, looking to the fourth factor, Dorothy understood that–through the power of attorney–Sheila was responsible for her day-to-day financial responsibilities. By granting her that power, Dorothy relied heavily on Sheila, making her highly susceptible to her daughter's influence.

¶44. Regarding the second and third factors, we find that Sheila failed to carry her burden of proof. No testimony was provided regarding Dorothy's knowledge that removing Ron and his children from the CDs would exclude them from a substantial portion of their inheritance. Many statements were made indicating that Dorothy understood Ron and his children to be well-off and without need for financial support. Testimony also was presented to show that Sheila and her daughters needed the assistance and that Dorothy wanted to be sure they were cared for. However, none of these statements tipped the scales to show that Dorothy *intended* Ron and his children to be entirely excluded from the CDs. Likewise, under prong two, Sheila failed to show that Dorothy understood she, Jennifer, and Jessica would be the "natural inheritors of her bounty," to the exclusion of Ron, Brad, and Melanie, affecting the original distribution under her will. Sheila therefore failed to rebut the presumption under this element.

3. Advice

24

¶45.    Turning now to the last factor under the test, we determine whether Dorothy exhibited independent consent and action through the advice of a competent person, disconnected from Sheila and wholly devoted to Dorothy's interest. Our caselaw requires this "advisor to have conferred with the grantor[] prior to the document drafting." *Murray*, 446 So. 2d at 579 (citing *McDowell v. Pennington,* 394 So. 2d 323 (Miss.1981)). "[A]dvice in this sense means advice separate and apart from the beneficiary, both in the initiation and execution of the instrument." *Id.*

¶46.    We have required that

> an advisor must have (a) knowledge upon which to base advice . . . (b) know[ledge] of the relationship of the grantor/testator to any beneficiary/grantee and the purpose or reason of an unequal division or distribution to donees/heirs of the same class, . . . (d) the relationship, or lack of relationship, to kinsmen, (e) knowledge of tax consequences[,](f) information as to the marital background, age, physical and mental health of a grantor/testator. (g) Inquiry by the advisor into whether the disposition is the free and voluntary act of an independent thinking, strong willed individual or whether the decision is imposed by the dominance of an over-reaching person will help him render better advice. All these factors will help the advisor learn of antecedent agencies that gave rise to the presumption of undue influence.

*Murray*, 446 So. 2d at 579 (Miss.1984). Again, Sheila failed to present clear and convincing evidence that Dorothy conferred with an advisor prior to instructing Sheila on the transfers. Sheila testified that Dorothy contacted the bank to inform it that Sheila would be visiting that afternoon to make changes to the CDs in the lockbox. However, Sheila did not hear the conversation and could not confirm its details. No one from People's Bank could confirm that this conversation occurred, nor was there a record that a call was made that day. Presumptively, Dorothy spoke with Eugenia Parsons, though no evidence was presented to

25

corroborate that presumption. Moreover, the only testimony presented regarding the discussion of any financial matters derived from Jennifer–another beneficiary of the transfers. We find that this evidence fails to meet the requirements under this prong.

¶47. "[A]fter all testimony relating to the [above]-named factors are received, it is still to the trier of fact to judge the credibility of the witnesses and the worth of their testimony." *Id*. In his witnesses' questioning during trial, the chancellor used language indicating his skepticism of the evidence Sheila presented. In response to Sheila's answer regarding whether the bank could make a house call to a longtime, home-bound client, the court interjected, "Well, I'm going to be honest with you, I smell a rat somewhere, and I'm wanting to see if I can get that odor gone." His concern was further indicated in his comment to the witnesses that it was highly unlikely that People's Bank–a bank "for the people"–would have penalized Dorothy for changing the CDs prior to maturity. He later came to the conclusion that the CDs "could have been changed" without penalty, before he dismissed Sheila as a witness. He also commented that he was shocked "[a] woman that has been stroked out, has been in hospital after hospital after hospital, rehabilitation after rehabilitation after rehabilitation," remained "sharp as ever," as Sheila repeatedly alleged.

¶48. The chancellor found that a confidential relationship existed between Sheila and Dorothy, and the transcript shows that the court found the witnesses presented did not establish the requisite evidence to rebut the presumption of undue influence. "The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Lee v. Lee*, 798 So. 2d 1284, 1288 (Miss. 2001). Yielding to this

26

discretion and finding that the chancellor's analysis was sound, we hold that Sheila and Dorothy maintained a confidential relationship, that Sheila failed to rebut the presumption of undue influence by clear and convincing evidence, and she abused her authority under the durable power of attorney.

### III.  Supersedeas Bond

¶49.    Both parties acknowledge this issue is moot, as there is nothing the Court can do retroactively to solve this issue. The appellants, however, ask that the Court address whether the chancellor abused his discretion by failing to approve a supersedeas bond and ordering the immediate distribution of the CDs for the purposes of future litigation. They claim that, even if the point is moot, the Court should consider this issue for the good of the public interest.

¶50.    This Court as a general rule will not adjudicate moot questions unless they fall within the purview of the "capable of repetition but evading review" doctrine or are a "matter of public interest." *Allred v. Webb*, 641 So. 2d 1218 (Miss. 1994). Two elements must be met to apply the "capable of repetition but evading review" doctrine: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again. *Id*. As the appellees concede is likely, this issue was in its duration too short to be fully litigated prior to its cessation.  There is not, however, a reasonable expectation that the same complaining party would be subject to the same action again.

¶51.    The appellants rely on ***Sartin v. Barlow*** to demonstrate there is a public-interest need to address this issue. ***Sartin*** states in part that "[t]here is an exception to the general rule as respects moot cases, when the question concerns a matter of . . . public interest[.]" ***Sartin v. Barlow ex rel. Smith***, 16 So. 2d 372, 376 (Miss. 1944).  There, this Court determined that the exception applies to any "question [which] concerns a matter of such a nature that it should be distinctly detrimental to the public interest," and that dismissal of the issue would be a failure "to declare and enforce a rule for future conduct." ***Id***.

¶52.    Mississippi law has not established a steadfast rule allowing or disallowing a supersedeas bond to be posted with the property at issue. The rule is that "a supersedeas or stay will not be granted . . . unless it appears to be necessary to prevent irreparable injury or miscarriage of justice . . . . Nor will it be granted . . . where it would permit such a change of status of the subject matter as to render further proceedings ineffectual or destroy the subject matter of litigation." ***Sartin***, 16 So. 2d at 376.  ***In re Estate of Taylor*** explains the use and discretion of granting a supersedeas bond:

> The trial court is empowered, subject to review by the appellate court, to require security in any amount or form the court "deems proper." The purpose of the supersedeas bond is to protect the judgment creditor pending review, sustaining the status quo post judgment.

***In re Estate of Taylor***, 539 So. 2d 1029 (Miss. 1989), *overruled on other grounds by **Stewart v. Prudential Life Ins. Co. of America***, 44 So. 3d 953 (Miss. 2010).

¶53.    The law as it currently stands affords trial courts proper discretion so they may protect appellees in these and similar situations.  Finding it will not be "distinctly detrimental to the public interest," we will not address this matter further.

## CONCLUSION

¶54.    We have held "if the judgment of a [trial court] can be sustained for any reason, it must be affirmed, and even though the trial judge based it upon the wrong legal reason." *Patel v. Telerent Leasing Corp.*, 574 So. 2d 3, 6 (Miss. 1990).  Here, the chancellor properly found a confidential relationship and an abuse of that relationship amounting to undue influence.  He employed the proper analysis and concluded that the beneficiary had failed to rebut the presumption of undue influence by the necessary burden of clear and convincing evidence.  Although the chancellor reached the "right result for the wrong reason," the court's findings are consistent with the judgment and are affirmed.  *Finnie v. Lee Cty. Bd. of Supervisors*, 186 So. 3d 831, 834 (Miss. 2016).

¶55.    **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, CHAMBERLIN AND ISHEE, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY MAXWELL, J.**

**COLEMAN, JUSTICE, CONCURRING IN PART, DISSENTING IN PART:**

¶56.    I agree with the majority opinion's determination that there was not an *inter vivos* gift in the instant case;  I also agree with the majority opinion that  "[w]hether Sheila abused her authority under the power of attorney by removing Ron, Brad, and Melanie from the original CDs, and replacing their names with Jennifer, Jessica, and herself, remains an issue . . . ." (Maj. Op. ¶ 21).  However, I cannot join the majority's analysis as it relates to the power of attorney issue, and I respectfully dissent from the majority opinion's decision to act as a trial

29

court in deciding that Sheila abused her power of attorney. Instead, I would remand for the chancery court to provide the appropriate analysis of the power of attorney issue.

¶57. The majority acknowledges that "the chancellor did not approach the issue [the possible abuse of the power of attorney] head-on." I submit that the chancery court should review the issue "head-on," instead of having the Court attempt to discern its own analysis from the present record. The Court's established standard of review of chancery court decisions leaves the weight and credibility of evidence and witnesses to the chancery court and "it is not this Court's province to undermine the chancellor's authority by replacing the chancellor's judgment with our own." *In re Estate of Carter*, 912 So. 2d 138, 143 (¶ 18) (Miss. 2005).

¶58. While the majority, in weighing the evidence, may believe there is an abuse of the power of attorney, the chancery court on remand, when reviewing the appropriate statutes and law and applying the relevant facts in the proper context, may reach a different conclusion than the one the majority is attempting to make for the chancery court.[5] The foregoing is particularly true because the majority focuses its analytical efforts and conclusion upon a straw man. Dorothy Johnson was not the decision-maker who changed the names on the certificates of deposits. Sheila West was. Accordingly, any influence over Dorothy Johnson's decision-making is not relevant unless it is evidence that pertains to her decision to give West power of attorney in the first place. In other words, the basis of the

---

[5] My position should not be construed as to imply that Sheila's actions were or were not an abuse of her power of attorney, I simply contend that the chancery court is the appropriate court to first make the decision.

30

majority's opinion is that Sheila unduly influenced Dorothy in having the CDs changed; however, the majority fails to take into consideration that Dorothy was no longer a decision maker to be influenced, due to the invocation of the undisputedly valid power of attorney.

¶59.    Further, a closer look at the statute and case relied upon by the majority for its standard is concerning as neither is at all related to whether one holding a power of attorney has abused the power.  To begin, the majority cites Section 81-5-63, which is a general banking statute that is designed to protects banks from liability for paying a person listed on a joint deposit.[6]  The majority opinion then cites **Foster v. Ross**, 804 So. 2d 1018 (Miss. 2012), which relies on Section 81-5-63 for the principle that "the creation of a certificate of deposit creates an automatic presumption of 'intent' to give ownership to the persons names on the CD, whether living or as survivors[, and s]uch presumptive title may be defeated upon proof of forgery, fraud, duress, or . . . unrebutted presumption of undue influence."

---

[6] The text of the statute is as follows:

When a deposit has been made or is hereafter made in the name of two (2) or more persons, payable to any one (1) of those persons, or payable to any one (1) of those persons or the survivor, or payable to any one (1) of those persons or to the survivor or survivors, or payable to the persons as joint tenants, the deposit or any part thereof or interest or dividends thereon may be paid to any one (1) of those persons, without liability whether one or more of those persons is living or not, and the receipt of acquittance of the person so paid shall be a valid and sufficient release and discharge to the bank for any payment so made. The making of a deposit in that form, or the making of additions thereto, shall create a presumption in any action or proceeding to which either the bank or any survivor is a party of the intention of all the persons named on the deposit to vest title to the deposit and the additions thereto and all interest or dividends thereon in the survivor or survivors.

Miss. Code Ann. § 81-5-63(1) (Rev. 2015). Subsection two is not relevant to the majority opinion's analysis; therefore, it is not included.

31

However, the majority opinion does not explain that in *Foster*, no power of attorney document was utilized at any point by any one. We should not apply to today's case a legal standard from a statute and case that do not involve the question of whether the power of attorney was abused.

¶60.     I join the majority's analysis finding there was no *inter vivos* gift in the present case. Because it is the better course for the Court, as an appellate court, to remand the case to the chancery court for the chancery court to perform the appropriate analysis, focused on the correct actor and law, I respectfully dissent.

**MAXWELL, J., JOINS THIS OPINION IN PART.**