724 So.2d 1054 (1998)
Melinda Lee SIMMONS, Appellant,
v.
Jeffrey L. SIMMONS, Appellee.
No. 98-CA-00072 COA
Court of Appeals of Mississippi.
December 18, 1998.
*1056 Robert H. Broome, Batesville, Attorney for Appellant.
D. Reid Wamble, Attorney for Appellee.
BEFORE McMILLIN, P.J., HERRING, AND KING, JJ.
McMILLIN, P.J., for the Court:
¶ 1. The dispute now before the Court grew out of a divorce proceeding between Melinda Simmons and her husband, Jeffrey Simmons. Melinda Simmons sought to have certain assets titled in the name of Mr. Simmons's mother and grandmother declared to be marital assets and subject to equitable division. The chancellor declined to do so and Melinda Simmons appealed. We affirm.

I.

Facts
¶ 2. Prior to the marriage of these parties and at a time when Mr. Simmons was married to someone else, legal title to a commercial building in the city of Clarksdale was acquired in the name of Opal Herndon, Mr. Simmons's grandmother. There was some evidence that Mr. Simmons was active in the acquisition and that the property was being acquired for his benefit, but was being titled in Mrs. Herndon's name because Mr. Simmons's wife at the time did not approve of the purchase. There was countering evidence offered that Mrs. Herndon was acquiring the property for her own use, hoping to convert it to a residence for herself so that she could move from Pontotoc to Clarksdale to be closer to members of her family living in Coahoma County. Mr. Simmons's former wife testified at the trial and indicated that she had not considered the building a part of their marital assets at the time she and Mr. Simmons were divorced.
¶ 3. After Jeffrey and Melinda Simmons were married, they operated a jewelry business and a dress rental business out of the property. They subsequently refurbished an unused part of the building as a residence and lived in the property. Mrs. Herndon testified that she agreed to their occupancy under an oral rental arrangement with her grandson in which he would pay the note obligation, insurance, and taxes on the building as rent.
¶ 4. Also, during the course of their marriage, Jeffrey and Melinda Simmons made arrangements to purchase a Harley Davidson motorcycle. Originally, the ownership papers were prepared to show legal title vested in Melinda Simmons. However, at the last minute, with Melinda Simmons's full knowledge and participation, the title to the motorcycle was vested in Jean Simmons, Mr. Simmons's mother. Melinda Simmons testified at trial that this change was made because the couple was being audited by the Internal Revenue Service and the plan was apparently to try to put that asset beyond the reach of the taxing authorities in the event of an adverse outcome on the audit. Mr. Simmons and his mother, on the other hand, testified *1057 that the motorcycle was titled in the mother's name as a means of repaying prior loans she had made to her son. They made no claim, however, that actual possession of the motorcycle was delivered to the mother at the time of purchase or at any time thereafter.
¶ 5. Melinda Simmons, in this proceeding, sought to have legal title to these two assets impressed with a trust for the benefit of her and her husband so that the assets would become marital property subject to equitable division. The chancellor refused to declare the existence of such a trust, holding that Melinda Simmons had failed in her burden of proving her claim by clear and convincing evidence. This appeal ensued in which the sole issue presented is whether the chancellor's decision was an abuse of discretion as being contrary to the great weight of the credible evidence.

II.

General Discussion

A.

The Nature of the Trust Sought to be Enforced
¶ 6. In the absence of a written trust agreement, equity will, in the proper circumstance, recognize that property legally titled in the name of one individual is, in reality, held for the use and benefit of another and will enforce the true owner's rights accordingly. It will do so by imposing an equitable trust on the bare legal title to the property in order to protect the interest of that person actually entitled to the benefits of ownership of the property. Such a trust, often referred to generically as an implied trust, arises out of the surrounding facts and is not normally evidenced by any writing. In fact, the terms of an implied trust will, inevitably, be in conflict with the written evidence concerning the title to property covered by the trust. The purpose of such an implied trust is to prevent an injustice that might otherwise occur if the formal laws of title to property were to be strictly applied.
¶ 7. Under the general principles of trusts arising by implication, equity has recognized two major branches that are of some concern in this case. GEORGE GLEASON BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 451 (2d ed. rev.1991). One is commonly called a constructive trust and is designed to prevent fraud, overreaching, or other wrongful act by which one person has obtained legal title to property rightfully belonging to another. Id. The other is referred to as a resulting trust and is one designed to give effect to the unwritten but actual intention of the parties at the time of acquisition of title to the affected property. Id. Thus, the principal distinction between the two is that, in a constructive trust, the acquisition of title is somehow wrongful as to the purported beneficiary; whereas, in a resulting trust, the acquisition, as between the trustee and the beneficiary, is mutually agreeable and the inequity arises out of the trustee's subsequent unwillingness to honor the terms of the parties' original agreement.
¶ 8. In Allgood v. Allgood, the Mississippi Supreme Court recognized the two forms of implied trusts but, in a footnote, suggested that a resulting trust is but a variation of the more general heading of constructive trusts since both involve the reallocation of legal title based on equitable considerations. Allgood v. Allgood, 473 So.2d 416, 421 n. 1 (Miss.1985). In Allgood, the court suggested that the proof was lacking as to all of the essential elements of a resulting trust. Nevertheless, concluding that there were equitable considerations that compelled a finding that the record owner actually held title for the benefit of another, the court impressed a constructive trust on the property. Allgood, 473 So.2d at 421.
¶ 9. Melinda Simmons contends that she is entitled to relief under the theory announced in the Allgood decision. Assuming for the sake of argument that Melinda Simmons could prove her allegations under the strict standard imposed in such matters, we are satisfied that we are factually dealing with the concept of a resulting trust rather than a constructive trust. There is no allegation that either Mr. Simmons's mother or grandmother acquired title to the contested assets by any fraud or unprincipled conduct intended to wrongfully deprive Mr. Simmons or Melinda Simmons of the title. Rather, *1058 Melinda Simmons's theory is that all parties were in agreement that the assets were actually being purchased by Mr. Simmons (in the case of the building) and by Mr. Simmons and Melinda Simmons jointly (in the case of the motorcycle), but that legal title was to be held by Mr. Simmons's grandmother and mother as an accommodation to Mr. Simmons and Melinda Simmons based on special considerations that made it undesirable for the true owner or owners to hold legal title.
¶ 10. In Mississippi, it has been recognized that where one buys an asset in the name of another, the asset will be deemed held by the record owner in a resulting trust for the benefit of the person actually advancing the purchase money. Brabham v. Brabham, 226 Miss. 165, 172, 84 So.2d 147, 151 (1955). That proposition more properly fits the facts before us than those related to a constructive trust, involving as it does, some allegation of wrongdoing by the record owner against the equitable owner arising out of the acquisition of the property.
¶ 11. We will, therefore, discuss the case in terms of concepts relating to a resulting trust though the parties argued the case on the constructive trust principles announced in Allgood. This does not, however, constitute an abandonment of the parties' underlying argument since both forms of implied trusts rely on the same or closely related equitable principles for their viability.

B.

The Burden of Proof
¶ 12. One seeking to impose an implied trust, whether a constructive or resulting trust, as a means of defeating legal ownership of a particular asset has an imposing burden. The burden is beyond a mere preponderance of the evidence. Rather, the proponent of such a trust has an obligation to establish the necessary facts by clear and convincing evidence. Shumpert v. Tanner, 332 So.2d 411, 412 (Miss.1976); Stovall v. Stovall, 218 Miss. 364, 376, 67 So.2d 391, 396 (1953).
¶ 13. With these preliminary considerations in mind, we will consider the two separate rulings of the chancellor to determine whether we can discover the abuse of discretion in those rulings that Melinda Simmons claims to have occurred.

III.

The Commercial Building
¶ 14. Title to the commercial building was vested in Mr. Simmons's grandmother at a time when Melinda Simmons was not involved in the matter at all. Mr. Simmons was married to another person and, even according to Melinda Simmons's theory of her case, the reason for taking title in someone other than Mr. Simmons was confined to considerations involving the former wife. Therefore, Melinda Simmons has no standing to claim that she was the beneficiary of a resulting trust created at the time of purchase. Under her theory, Mr. Simmons was the sole beneficiary of the trust. There is no basis to argue that her own subsequent efforts in regard to the property gave rise to a claim that equitable title subsequently accrued directly to her. There is no allegation or evidence that, after her marriage to Mr. Simmons, the arrangement with the grandmother was modified in some manner to include her as an equitable owner.
¶ 15. Melinda Simmons's standing to pursue her claim arises, therefore, somewhat indirectly. She seeks an adjudication, not that she has a direct equitable claim of title, but that the equitable title lies with her husband, Mr. Simmons. It is only then that her potential interest arises in the property in the context of the divorce proceeding since she is entitled to seek equitable division of marital assets without regard to which spouse is the "owner" of the asset in the more traditional sense of the term. Ruff v. Ruff, 645 So.2d 944, 946-47 (Miss.1994); Ferguson v. Ferguson, 639 So.2d 921, 926 (Miss. 1994).
¶ 16. The chancellor concluded that Melinda Simmons's proof that her husband was the real owner of the property despite the fact that his grandmother was the record title-holder failed to meet the high standard imposed by the law as to such matters. We are unconvinced by arguments that the chancellor was manifestly incorrect *1059 in that determination. There was conflicting testimony on the point. In that situation, the responsibility for assessing the credibility of the various witnesses and deciding what weight ought to be accorded to each witness's testimony is vested in the fact-finder. In the case of a chancery proceeding without jury, the chancellor sits as finder of fact. Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994). It is not within the prerogative of an appellate court to re-weigh the evidence and reach an independent decision as to whether the court agrees or disagrees with the chancellor. Rather, on appeal, our authority is limited to interceding only to correct what we consider to be a manifest error in the chancellor's decision on the facts.
¶ 17. The chancellor apparently found the testimony of Mr. Simmons's grandmother persuasive. She testified that her grandson made the down payment as an accommodation to her and that she reimbursed him in cash shortly thereafter. There was no dispute that the loan for the purchase price was in her name and that she had made some of the payments and had paid the loan off in full after the difficulties arose between Mr. Simmons and Melinda Simmons. She also testified that she maintained insurance coverage on the premises at her own expense, at least part of the time.
¶ 18. Melinda Simmons presented evidence that suggested a contrary set of facts. She testified that the grandmother had, on some occasions, acknowledged to her that Mr. Simmons was the true owner of the property. She also presented evidence that she and her husband had expended considerable sums in improving the property that would, at least on the face of it, appear inconsistent with what would be expected of mere tenants at will. As we have observed, it is the chancellor's duty to resolve disputed issues of fact. On this conflicting evidence, we do not find Melinda Simmons's evidence of a trust in favor of her former husband so compelling that we can say with the necessary certainty that the chancellor was manifestly wrong in deciding against her. For that reason, we are obligated to affirm the chancellor on this issue.

IV.

The Harley Davidson Motorcycle
¶ 19. The evidence most favorable to Melinda Simmons on the issue of the motorcycle came from Melinda Simmons herself. She testified that, by the time the couple had accumulated sufficient money to pay the purchase price on the motorcycle, they were under audit by the Internal Revenue Service and the decisionone in which she actively participatedwas made to place title in the name of Mr. Simmons's mother to avoid any hazard that the asset might be seized by the taxing authorities.
¶ 20. Mr. Simmons and his mother countered this evidence with a claim that title to the motorcycle was conveyed to her in satisfaction of previous loans that she had made to her son.
¶ 21. The chancellor found that Melinda Simmons had failed to prove an implied trust by clear and convincing evidence. We note, without becoming involved in a detailed analysis of the evidence and the logical inferences that would seem to necessarily arise from that evidence, that Melinda Simmons presented a much stronger case of a resulting trust in this instance than she did in regard to the building. There is no dispute that she and Mr. Simmons paid all of the purchase price for the vehicle, and there appears little real chance that the parties suddenly decided to convey title to Mr. Simmons's mother at the last minute in order to repay prior loans made by her to her son. One of the fundamental indications of ownership is the right to immediate possession and enjoyment of the property, and there is no evidence that the mother wanted to or intended to take immediate possession of the motorcycle. She testified that she did not even know of the decision to title the vehicle in her name until some time after the fact. Taken in its best light, the evidence of Mr. Simmons and his mother would indicate an intention to impress some sort of equitable lien on the motorcycle to secure the repayment of the loans, much like instances in real property conveyancing where, when the facts dictate, an absolute conveyance has been adjudicated to be a mortgage in equity. See, *1060 e.g., Sweet v. Luster, 513 So.2d 1240, 1242 (Miss.1987); Dunn v. Dedeaux, 243 Miss. 187, 192, 137 So.2d 822, 824 (1962). Assuming, for sake of argument only, that the law would give effect to such an equitable lien, the lien would not defeat Melinda Simmons's claim of equitable title. It would merely pose a question of priority between Melinda Simmons's ownership and Mr. Simmons's mother's non-possessory lien.
¶ 22. Therefore, were it not for a further consideration which we raise on our own motion, it would appear that Melinda Simmons's version of events is so credible and the countering version so incredible that there is a substantial likelihood that we would conclude that the chancellor erred in failing to find a resulting trust in this instance. However, we find ourselves compelled to take note that Melinda Simmons sought the aid of a court of equity to impress this resulting trust on the title of the motorcycle. One of the maxims of equity is that a litigant must come into equity with clean hands. Calcote v. Calcote, 583 So.2d 197, 199-200 (Miss.1991); V.A. GRIFFITH, MISSISSIPPI CHANCERY PRACTICE § 32 (2d ed.1950). By her own testimony, Melinda Simmons has testified that she participated in a scheme whose sole purpose was to place an asset actually belonging to her and her husband beyond the reach of federal taxing authorities at a time when she knew that she was under investigation by the Internal Revenue Service. There can be no doubt that her participation in the scheme of putting legal title to the motorcycle in her mother-in-law's name was prompted by her fear, whether well-founded or not, that the tax audit would ultimately result in the seizure of assets in satisfaction of some yet-undetermined tax liability. Such a purpose is not one that a court of equity can sanction. The Restatement of the Law of Trusts, Second provides that:
Where a transfer of property is made to one person and another pays the purchase price in order to accomplish an illegal purpose, a resulting trust does not arise if the policy against unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction.
RESTATEMENT (SECOND) OF TRUSTS § 444 (1959).
¶ 23. The Restatement makes clear that the term "illegal" as used in this context encompasses something more than the violation of a criminal statute. In the official comments, the Restatement says that "[t]he most common situation in which the principle stated in this Section is applied is that in which the purchaser of property takes title in the name of another for the purpose of defrauding his creditors." Id. at § 444 cmt. a.
¶ 24. Mississippi has followed the notion that equity may not be invoked to enforce a resulting trust when the original transaction was entered into for an improper purpose and one of the participants in the transaction is the plaintiff. In Collins v. Collins, the plaintiff sought to compel his former wife to reconvey property placed in her name for the purpose of avoiding its possible seizure to satisfy criminal fines assessed against the plaintiff. Collins v. Collins, 625 So.2d 786, 787-88 (Miss.1993). The supreme court declined any relief based on the improper purposes of the original transfer. Id. In Thigpen v. Kennedy, the plaintiff had purchased certain land but put the title in his girlfriend's name because he anticipated divorcing his wife and did not want her to assert any claim to the lots. Thigpen v. Kennedy, 238 So.2d 744, 745-46 (Miss.1970). The chancellor granted relief, but the supreme court reversed, finding that "[t]ransfers of this nature and for such purposes are in violation of the statute of frauds and contrary to public policy." Id. at 746.
¶ 25. The Thigpen decision supports the proposition that the Court may raise the public policy issue on its own motion.
The maxim is often stated in the following language, `he who doeth fraud, may not borrow the hands of the chancellor to draw equity from a source his own hands hath polluted.' The maxim is not to be lightly considered and brushed aside. It is the duty of the Court to apply it of its own motion when it becomes evident that the facts are such that they call for the application of the maxim.

Id. at 747 (emphasis supplied).
¶ 26. This Court will not, for reasons of public policy, give aid to one who seeks to *1061 undo the unintended consequences of a tax-avoidance scheme. In so holding, we do not suggest that Melinda Simmons failed in her proof. As we have already observed, were it necessary to answer the question, we would be inclined to hold that she did, in fact, prove a resulting trust in the motorcycle by clear and convincing evidence. Our decision is simply that we will not aid any of the participants in this scheme in enforcing the terms of this implied trust. As the Bogert treatise states:
Some courts state that "no trust results" to the fraudulent payor of the consideration. It would seem more accurate to hold that a trust results, but that the beneficiary of it will not receive aid from the court in the enforcement of the trust because of his unconscionable conduct. His creditors who are innocent of any wrongdoing should be allowed to get the benefit of his equitable interest.

BOGERT, supra, at § 463 (emphasis supplied).
¶ 27. Were the claimant in this case an innocent third-party creditor, the facts in this case might easily produce a different result. It is the complicity of Melinda Simmons in the scheme and not the innocence of Mr. Simmons and his mother that compels the result we reach today. Thus, we affirm the chancellor's decision though we think there is a strong likelihood that he reached the right result for the wrong reason. The practice of affirming on this basis is one approved by the Mississippi Supreme Court. See, e.g., Tedford v. Dempsey, 437 So.2d 410, 418 (Miss.1983). However, because of the different rationale by which we deny Melinda Simmons relief, it should be understood that this decision is not res judicata on the issue of whether Mr. Simmons's mother rightfully holds title to the motorcycle free of any equitable claims. There is no indication that any entity exists, innocent of involvement in the scheme, with standing to attempt to have the title taken out of Mr. Simmons's mother's name, but, if such an entity exists, this decision (unlike the chancellor's) does not cut off that claim. By the same token, neither does this decision constitute a binding determination that such a claim, if asserted, would necessarily be meritorious. It is simply a question that is left open by the result we reach today.
¶ 28. It is our customary practice to assess the costs of an appeal to the losing party. However, because of the unique nature of this case, we elect, in the exercise of our discretion, to divide the costs of the appeal equally between the appellant and the appellee.
¶ 29. THE JUDGMENT OF THE CHANCERY COURT OF COAHOMA COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE TAXED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
BRIDGES, C.J., THOMAS, P.J., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR.