# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00488-COA

**JACOB B. AINSWORTH**                                              **APPELLANT**

**v.**

**MARILYN AINSWORTH PLUNK AND**                          **APPELLEES**
**CRYSTAL A. AINSWORTH**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/2021 |
| TRIAL JUDGE: | HON. DAVID SHOEMAKE |
| COURT FROM WHICH APPEALED: | SMITH COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MARK K. TULLOS |
| ATTORNEYS FOR APPELLEES: | MARILYN AINSWORTH PLUNK (PRO SE) |
| | CRYSTAL A. AINSWORTH (PRO SE) |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 08/02/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., McCARTY AND SMITH, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     This appeal arises from a father's refusal to transfer title to real property back to his

two daughters after agreeing to do so.  The chancery court granted the daughters' demand

for the land.  The chancery court found that the father created a constructive or a resulting

trust after he refused to deed the land back to his daughters.  Finding no error, we affirm.

## FACTS

¶2.     In 2001, Jacob Ainsworth deeded his two daughters Marilyn and Crystal 204 acres of

land.  They received a warranty deed, and their father reserved a life estate for himself.

Ainsworth testified he was about to get remarried; in case he got divorced, he wanted to

make sure the land would not be considered a marital asset. According to Ainsworth, he wanted the land back if he got divorced. Years after he deeded the land to his daughters, Ainsworth did indeed get divorced.

¶3. The daughters testified that four years after his divorce, their father told them he began to have second thoughts about the land reconveyance. At that point, the deed gave the daughters rights as joint tenants with full rights of survivorship. Marilyn testified her father told her he wanted them to deed the land back to him. He would then execute a new deed where the daughters would be tenants in common with full rights to devise their one-half interest.

¶4. During this time period, Ainsworth also discovered that Crystal, who is white, was about to adopt an African-American child. Ainsworth later testified the adoption did not influence his decision to ask his daughters to sign a deed to reconvey the land. However, Crystal testified her father advised her before adopting the baby to rethink her decision. Specifically, Ainsworth testified that Crystal "might better think about [the adoption] good, that that may not work out in the future and consider before she did it." Crystal testified that her father had advised her to rethink her decision, to "give that baby back to [the] mom," and "[y]ou've made a big mistake."

¶5. Nonetheless, the daughters signed a quitclaim deed conveying their remainder interest in the 204 acres back to their father. Marilyn later spoke to him about his promise to refashion the deed in their favor. But she testified her father said the only way he would deed back the land to his daughters was if Crystal gave up her adopted baby. Marilyn recalled her

2

father said "he didn't want [an] 'n' word baby to have anything to do with this particular land, that this was Ainsworth land and it was only ours and any Ainsworths," and no one else's.

¶6. Nothing happened for two years. Then, the daughters hired an attorney to assist them to get the land back. Marilyn and the attorney met with Ainsworth. At trial, the attorney testified the purpose of the meeting was to discuss the agreement to convey the property back to Marilyn and Crystal. The attorney asked Ainsworth when he planned to do it but was told, "I'm not sure when I'm going to do that. I may not do that." The attorney further testified that Ainsworth never denied there was an agreement; he only responded that he did not know *when* he would convey the property back or whether he would.

## PROCEDURAL HISTORY

¶7. The daughters filed a complaint against Ainsworth. They asked the chancery court to either enter a judgment ordering Ainsworth to convey title to the land back to the daughters per their agreement or, alternatively, order Ainsworth to fairly compensate them for the value of the property in dispute.

¶8. After trial, the chancery court entered a final judgment. The chancery court found the daughters had met their burden of proof by clear and convincing evidence that a constructive or resulting trust existed. Further, the chancery court found Ainsworth had wrongfully acquired title to the 204 acres of land. In its final judgment, the chancery court held "Marilyn Plunk and Crystal Ainsworth have met their burden of proof by clear and convincing

3

evidence that indeed there was an unwritten agreement between them and the Defendant, Jacob Ainsworth, . . . resulting in inequitable harm to the Plaintiffs."

¶9.     Critically, the chancery court grappled with the question of the father's credibility, going so far as to declare, "[A] better question was what the court found that [Ainsworth] was telling the truth about." In regard to his marriage and eventual divorce, the court stated, "[E]ven prior to his marriage, [that] Mr. Ainsworth was already planning for his divorce shows [he was] cunning[.]" Ainsworth's "conduct constituted an act of conspiracy to commit a fraud against the future wife." By leaving his wife without rights to his land in a divorce, the court noted "that [Ainsworth] was willing and had the intent of maintaining control of his property by whatever means necessary, even to the extent of committing a fraud and committing a conspiracy to commit fraud." And further, "[w]hether by omission or commission, it does appear to the Court that Jacob Ainsworth, by his own admission, was attempting a fraudulent act in secreting away assets prior to marriage."

¶10.    The chancery court addressed the fact that when Ainsworth found out Crystal was planning to adopt an African-American baby, "[f]our years after his divorce, the Defendant suddenly decided that it was time to get his land back in his own hands." And "although Mr. Ainsworth contends that the adoption had no bearing on his asking his daughters to sign a deed to the land back to him . . . he told Crystal that if she wanted her land back, she should return the African-American child that she had adopted."

¶11.    This "admitted conduct" damaged the father's standing in the eyes of the court. The

4

court reasoned that "it was perfectly believable that he was willing, able and determined to make sure that no part of his estate would ever be owned by his African American adopted [grandchild] and the evidence shows that was the case."

¶12. Finally, Ainsworth "also admitted that he had lied to Marilyn and Crystal when he said that he would reconvey the land to them." Both daughters testified that "their father had tricked them into signing the deed." And "[b]y misrepresenting his intentions to his daughters, Mr. Ainsworth wrongfully acquired title to their land." Importantly, the chancery court found that "the Defendant's testimony in this case is not credible."

¶13. On the other hand, the chancery court found the two daughters' and the attorney's testimony to be credible, "especially in light of the fact that Mr. Ainsworth has proven quite capable of deception in his act of hiding assets from his future wife." The court further found that "[c]onsidering all of the facts that were presented in this case, their testimony that their father had tricked them into signing the deed . . . is credible."

¶14. After this decision, Ainsworth appealed.

## BACKGROUND

¶15. Our analysis must first be guided by the determination of what type of trust was created. The father's sole issue on appeal is that his daughters failed to prove that either a constructive or resulting trust was created.

### *Implied Trusts in General*

¶16. The chancery court did not expressly determine whether a constructive or a resulting

5

trust was created. Indeed, precedent has found little difference between the two. *Allgood v. Allgood*, 473 So. 2d 416, 421 n.1 (Miss. 1985) (finding that "there is little legal difference between the two implied trusts because they both involve the reallocation of legal title based on equitable considerations"). "[B]oth constructive and resulting trusts are creatures of equity." *In re Est. of Abernathy*, 778 So. 2d 123, 127 (¶18) (Miss. 2001).

¶17. There are two types of implied trusts: (1) constructive trusts and (2) resulting trusts. *Id*. "In the absence of a written trust agreement, equity will, in the proper circumstance, recognize that property legally titled in the name of one individual is, in reality, held for the use and benefit of another and will enforce the true owner's rights accordingly." *Simmons v. Simmons*, 724 So. 2d 1054, 1057 (¶6) (Miss. Ct. App. 1998). This Court continued, stating "[i]t will do so by imposing an equitable trust on the bare legal title to the property in order to protect the interest of that person actually entitled to the benefits of ownership of the property." *Id*. This particular trust, referred to as "an implied trust, arises out of the surrounding facts and is not normally evidenced by any writing." *Id*. In regard to the terms of an implied trust, it will, "inevitably, be in conflict with the written evidence concerning the title to property covered by the trust." *Id*. Finally, "[t]he purpose of such an implied trust is to prevent an injustice that might otherwise occur if the formal laws of title to property were to be strictly applied." *Id*.

### 1. Constructive Trusts

¶18. "A constructive trust is a judicially imposed remedy used to prevent unjust enrichment

6

when one party wrongfully retains title to property." *White v. White*, 325 So. 3d 666, 671 (¶20) (Miss. Ct. App. 2019) (internal quotation marks omitted). Our Supreme Court has held this "is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another." *Id*. (quoting *McNeil v. Hester*, 753 So. 2d 1057, 1064 (¶24) (Miss. 2000)).

¶19. This "judicially imposed remedy" is a broad one:

> A constructive trust is one that arises by operation of law against one who, *by fraud*, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Id*. at 672 (¶21) (emphasis added). "Examples of wrongful conduct that may justify imposition of a constructive trust include: (1) fraud, actual or constructive; (2) duress; (3) abuse of confidence; (4) commission of wrong; (5) any form of unconscionable conduct, artifice, concealment, or questionable means; (6) any way against equity and good conscience." *Id*. (citing *Joel v. Joel*, 43 So. 3d 424, 431 (¶24) (Miss. 2010)). "A constructive trust 'is a means recognized in our law whereunder one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.'" *Barriffe v. Est. of Nelson*, 153 So. 3d 613, 618 (¶27) (Miss. 2014) (quoting *Allgood*, 473 So. 2d at 421).

### 2. Resulting Trusts

¶20. In contrast, a resulting trust is one implied by law from the acts and conduct of the

7

parties and the facts and circumstances existing at the time and surrounding the transaction out of which it arises. *In re Est. of Abernathy*, 778 So. 2d at 128 (¶18). A resulting trust

> arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily *being no fraud or constructive fraud involved*.

*Id*. (emphasis added). "In other words, it is an 'intention-enforcing trust' designed to give effect to the *actual intention of a party* although that intention was not directly expressed." 8 Jeffrey Jackson et al., *Encyclopedia of Mississippi Law* § 73:3 (2d ed. updated Apr. 2022) (emphasis added); *see also Simmons*, 724 So. 2d at 1056 (¶7). "A resulting trust must be established by clear and convincing evidence, and the burden of proof in establishing the trust is on the proponent." *Id*.; *accord In re Est. of Abernathy*, 778 So. 2d at 128 (¶20).

### 3. The Difference Between Constructive and Resulting Trusts

¶21. The difference between these two creatures of equity is that "in a constructive trust, the acquisition of title is somehow *wrongful* as to the purported beneficiary; whereas, in a resulting trust, the acquisition, as between the trustee and the beneficiary, is mutually agreeable and the inequity arises out of the trustee's subsequent unwillingness to honor the terms of the parties' original agreement." *Simmons*, 724 So. 2d at 1057 (¶7) (emphasis added).

¶22. So the major difference between the two types of trusts is that in a constructive trust,

fraud is involved, and in a resulting trust, "there [is] ordinarily . . . no fraud or constructive fraud involved." *In re Est. of Abernathy*, 778 So. 2d at 128 (¶18).

¶23. This distinction leads us to the conclusion that the proof before the chancery court constituted a constructive trust. The chancery court's core ruling was its finding of fact that Ainsworth had lied to his daughters about the reason he chose not to reconvey the land back to them, and the court similarly found his credibility was lacking due to other instances of deceitful conduct. Additionally, the land transactions were not mutually agreed upon between the father and two daughters.

## STANDARD OF REVIEW

¶24. "We will not disturb a chancellor's findings if supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, or applied an incorrect legal standard." *Smiley v. Yllander*, 105 So. 3d 1171, 1174 (¶8) (Miss. Ct. App. 2012). "Whether a constructive trust exists is a question of law, which this Court reviews de novo." *Barriffe*, 153 So. 3d at 618 (¶26). "The party advocating a constructive trust must show by clear and convincing proof that a constructive trust is necessary as a matter of law." *Id*. "The proof must establish the facts and circumstances giving rise to the trust with an extraordinary degree of certainty and clarity." *Id*. (internal quotation marks omitted). The Supreme Court characterizes this as a "heavy burden." *Id*.

¶25. "Our scope of review of findings of fact is severely limited." *Allgood*, 473 So. 2d at 421. "Findings of fact made by a chancellor which are supported by credible evidence[] may

9

not be set aside on appeal." *Id.*

## ANALYSIS

¶26. In his one issue on appeal, Ainsworth argues his daughters "failed to bring forth by clear and convincing evidence that a 'resulting or constructive' trust arose" in this case.

¶27. Having already determined that this is a constructive trust, we turn to the applicable law. "A constructive trust is a judicially imposed remedy used to prevent unjust enrichment when one party wrongfully retains title to property." *White*, 325 So. 3d at 671 (¶20). Our Court in *White* also discussed examples of wrongful conduct that may justify imposing a constructive trust, including "(1) fraud, actual or constructive; (2) duress; (3) abuse of confidence; (4) commission of wrong; (5) any form of unconscionable conduct, artifice, concealment, or questionable means; [and] (6) any way against equity and good conscience." *Id.* at 672 (¶21) (citing *Joel*, 43 So. 3d at 431 (¶24)).

¶28. In one Supreme Court case, a son brought a suit against his mother, the landowner, claiming title to real property and mineral interests. *Allgood*, 473 So. 2d at 420. The chancery court found that the mother had held the land in trust for her son and declared the son to be the true owner of the property and mineral interests. *Id.*

¶29. The Supreme Court affirmed, concluding the mother actually held title for the benefit of her son, and found that the trust at issue was a constructive trust. *Id.* at 421. With regard to the law behind a constructive trust, the Court found "[s]ubstantial overreaching or fraud must be shown." *Id.*

¶30.    The Court noted the chancery court's findings, explaining that "[t]he trial judge patiently listened to the witnesses and has resolved all material fact questions in a manner well within his authority." That "it requires little imagination to perceive that upon the facts found [the mother] unfairly holds title and ought in equity be required to convey it to [her son]." *Id*. The Court concluded, "[T]he judgment below to the effect that [the mother] must convey to [her son] the 13-acre patch of land can only be affirmed." *Id*. at 422.

¶31.    Over thirty years later, this Court dealt with a similar issue where a son refused to transfer title to real property to his mother after promising to do so in return for her making payments on the deed of trust. *White*, 325 So. 3d at 669 (¶2). The son initially obtained land, and a deed of trust was executed to him as a result. *Id*. at (¶4). However, the son failed to make payments on the land and asked his mother for help with making the payments. *Id*. at (¶5). The mother agreed to take over the payments, and she later stated that her son orally agreed to transfer his interest in the property to her if she made the payments. *Id*. When the mother attempted to sell the land some months after she had completed making the payments, she discovered that her son had never transferred the title to her. *Id*. at 671 (¶6). Rather, "[h]er son had broken his promise." *Id*.

¶32.    The mother sued her son, and the chancery court found that she had "fail[ed] to plead any of the requisite elements for the imposition of a constructive trust." *Id*. at (¶10). The mother appealed, arguing that a constructive trust existed. *Id*. at (¶11).

¶33.    We reversed and remanded, finding "a constructive trust may provide a remedy for

11

the mother." *Id*. at 669 (¶3). We held that a constructive trust "is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another." *Id*. at 672 (¶20) (quoting *McNeil*, 753 So. 2d at 1064 (¶24)). In discussing the burden of proof, we stated that "[i]t 'is a question of law' whether this legal remedy should be applied 'to the set of facts at hand.'" *Id*. at 672 (¶23) (quoting *McNeil*, 753 So. 2d at 1064 (¶26)). Relying on the mother's complaint, we took her factual allegations as true and found it was premature for the chancery court to dismiss the case entirely before allowing discovery and "the taking of proof on these fact-intensive issues." *Id*. at 673 (¶28).

¶34. Finally, we pointed out two well-established principles. First, "'if there is no adequate remedy at law, equity will step in.'" *Id*. at 674 (¶33) (quoting *Tolbert v. Southgate Timber Co.*, 943 So. 2d 90, 99 (¶31) (Miss. Ct. App. 2006)). Second, "'[e]quity will not suffer a wrong without a remedy . . . .'" (quoting *Emmons v. Emmons*, 217 Miss. 594, 600, 64 So. 2d 753, 755 (1953)).

¶35. Here, the chancery court found an implied trust existed as to the 204 acres of land. The court made a factual finding that Ainsworth convinced his daughters to reconvey the land back to him; in doing so, his conduct was wrongful and fell within the purview of "any form of unconscionable conduct, artifice, concealment, or questionable means" and "any way against equity and good conscience." *White*, 325 So. 3d at 672 (¶21) (citing *Joel*, 43 So. 3d at 431 (¶24)). According to the chancery court, Ainsworth's admitted conduct and his

12

daughters' testimony at trial proved "their father had tricked them into signing the deed."

¶36.    And after Ainsworth divorced, he did not ask for his land back.  It was *only* after learning that his daughter Crystal was planning to adopt an African-American baby that Ainsworth sprang into action.  He explained to his daughters that if they would deed the property back to him, he would subsequently divide the property and give them each a deed as tenants in common, rather than as tenants in the entirety.  This devise would allow each of them to devise their undivided one-half interest in the property as they saw fit.  Relying on their father's promise to reconvey the land, the daughters signed a quitclaim deed, which was then recorded.  But both daughters testified that their father said the only way they would get the land back was if Crystal returned the African-American baby she had adopted.

¶37.    Further, the two daughters provided the only evidence in the record concerning the nature of the transfer of the land back to their father.[1]  In his testimony at trial, Ainsworth actually denies his daughters' testimony when they said they had an agreement with him that he would deed the land back to them.  Yet there was no evidence or testimony presented on behalf of Ainsworth to deny that this agreement between him and his daughters had taken place, other than Ainsworth's sole testimony.  Ainsworth further testified that he was not going to give the land back to his daughters: "I never told - - the part where I said I was supposed to give it back or anything like that. I never said anything like that."

---

[1] To some extent, Ainsworth argues his original conveyance to his daughters created an implied trust.  Yet the chancery court held, "[T]here was absolutely no proof offered other than his own uncorroborated word that such an agreement existed."

13

¶38. Additionally, when the attorney and Marilyn met with her father to discuss when Ainsworth would reconvey the land to his daughters pursuant to their agreement prior to signing the quitclaim deed, Ainsworth did not admit, nor did he deny the terms of the prior agreement. According to testimony of the attorney, Ainsworth stated that he did not know when he was going to reconvey the land and that he might never give it back.

¶39. A party arguing the existence of a constructive trust "must show by clear and convincing proof that a constructive trust is necessary as a matter of law." *Barriffe*, 153 So. 3d at 618 (¶26).[2] The chancery court found that Ainsworth had anticipated his divorce prior to even getting married and hid his property from his future wife. The chancery court further found Ainsworth lied to his daughters about reconveying the land to them upon discovering that Crystal was about to adopt an African-American baby. Most importantly, the court determined he ultimately had no credibility, stating that the "[d]efendant's testimony in this case is not credible."

## CONCLUSION

¶40. In *White*, we concluded that "our law has long recognized an equitable solution to the exact scenario presented to us." *White*, 325 So. 3d at 671 (¶19). Here, the chancery court

---

[2] While the trust here straddles the line between constructive or resulting trusts, we find it necessary to emphasize it is indeed a constructive trust. The defining line between the two types of trusts is if fraud is involved. *See In re Est. of Abernathy*, 778 So. 2d at 128 (¶18) (in a resulting trust "there [is] ordinarily . . . no fraud or constructive fraud involved"); *Simmons*, 724 So. 2d at 1057 (¶7) ("in a constructive trust, the acquisition of title is somehow wrongful as to the purported beneficiary").

properly found the remedy of an implied trust applied under the unique facts of this case.

¶41.   **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**