# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01079-COA

| | |
|---|---|
| MARK J. TITUS, SR., MARK J. TITUS, JR., JESSICA LYNN TITUS AWAD AND ERIC SCOTT TITUS | APPELLANTS |

v.

| | |
|---|---|
| JOAN GAIL STELZER | APPELLEE |

DATE OF JUDGMENT: 09/21/2022
TRIAL JUDGE: HON. DEBORAH J. GAMBRELL
COURT FROM WHICH APPEALED: PEARL RIVER COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANTS: JAMES L. GRAY
ATTORNEY FOR APPELLEE: CHRISTOPHER M. HOWDESHELL
NATURE OF THE CASE: CIVIL - REAL PROPERTY
DISPOSITION: AFFIRMED - 09/26/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Joan Stelzer filed suit in the Pearl River County Chancery Court to confirm and quiet title to forty acres of property conveyed to her on July 8, 2011, by her then son-in-law, Mark Titus Sr. In the lawsuit, Stelzer sought to set aside an April 14, 2021 quitclaim deed that Titus Sr. signed, by which he conveyed this property to his five children, Mark Titus Jr., Jessica Titus Awad, Eric Titus, Samantha Titus, and Luke Titus,[1] using a Louisiana power of attorney Stelzer had executed in December 2011. Stelzer contended that as of April 2021,

---

[1] Samantha and Luke were children by Titus Sr.'s second wife, Valerie, who was also Stelzer's daughter. Samantha and Luke deeded their interest in the property to Stelzer prior to her filing suit against Titus Sr. and his other children.

she held valid title to the property, that she had revoked the power of attorney she had given Titus Sr., and that she had not consented to Titus Sr. conveying the property to all his children. Titus Sr. and his children from a prior marriage (the "Tituses") contended that Titus Sr. originally deeded the property to Stelzer to hold it in trust for all of Titus Sr.'s children. The chancery court set aside the April 14, 2021 deed Titus Sr. had signed, and the Tituses appealed.

¶2. On appeal, the Tituses argue that Titus Sr.'s conveyance of the property to Stelzer was intended to create a "resulting trust" in favor of all Titus Sr.'s children. In addition, they contend that despite the power of attorney Stelzer signed, Titus Sr. owed no fiduciary duty to Stelzer. Further, they claim that the chancery court erred by failing to dismiss the lawsuit when all necessary parties had not been joined. Having considered the arguments of the parties and the relevant precedent, we affirm the chancery court's judgment.

### Facts

¶3. Titus Sr. purchased forty acres of property located in Pearl River County in two parcels, one purchased on June 12, 1986; the other on December 7, 2000. The 1986 deed named Titus and his first wife, Sylvia, as the grantees, who owned the property as joint tenants with rights of survivorship. In 2000, Titus Sr. obtained the other half of the forty acres as a result of a division of adjoining property that Titus Sr. owned with his brother and sister.

¶4. Titus Sr. and Sylvia divorced in Louisiana on December 2, 1991, and Titus Sr. was granted sole custody of their three children, Mark Jr., Jessica, and Eric. When Sylvia failed

2

to deed her interest in the Mississippi property to Titus Sr., as required by their divorce decree, Titus Sr. filed an action in the Pearl River County Chancery Court requesting that the court extend full faith and credit to the Louisiana divorce judgment, which included a community property agreement he and Sylvia signed. On August 19, 2002, the chancery court granted Titus Sr.'s petition and adjudicated him to be the owner of all of Sylvia's interest in the property.

¶5.     Thereafter, Titus Sr. married Valerie Stelzer Titus who stopped working to become a stay-at-home mom to his three children and the two they had together, Samantha and Luke. Valerie was wholly dependent on Titus Sr. for support. Titus Sr. and Valerie lived in New Orleans with the children and Valerie's mother, Stelzer.

¶6.     On June 29, 2011, Titus Sr. was named in a bill of information filed in a Louisiana federal district court charging him with conspiracy to commit mail fraud.[2] Initially, the government indicated that it was not seeking the forfeiture of any property, and on July 8, 2011, Titus Sr. conveyed the forty acres he owned in Mississippi to Stelzer. The purpose and intent of this transfer is the subject of this dispute. Stelzer and Valerie testified that the forty acres were intended to provide support for Valerie and her two children by Titus Sr. should he be incarcerated. But Titus Sr. claimed that the transfer of the Mississippi property was made for the benefit of all five of his children. At the same time as the transfer of the Mississippi property, Titus Sr. and Valerie also conveyed to Stelzer two other properties that

---

[2] Titus Sr. managed the day-to-day operations of a construction management company that was responsible for paying sub-contractors on a project for the United States Army Corps of Engineers. It was alleged that fraudulent payments were made to TLT Properties LLC, a company Titus Sr. controlled.

they owned in New Orleans.

¶7.	While criminal proceedings were pending, on December 16, 2011, Stelzer executed a document entitled "Act of General and Special Mandate and Procuration" (power of attorney) appointing Titus Sr. as her attorney in fact. The purpose of this document remains disputed. Stelzer testified that she signed the document to allow Titus Sr. to act on her behalf in resolving issues in Chicago regarding the death of her sister. Although Titus Sr. agreed that the power of attorney was signed for that reason, he contended that Stelzer also signed it so that he could deal with the properties he had conveyed and entrusted to her.

¶8.	Titus Sr. was not formally indicted but entered a "Plea and Cooperation Agreement" with the federal government by which he pleaded guilty to mail fraud. He served a sentence in federal prison from November 2012 to January 4, 2017. When the government decided it would seek forfeiture, the Louisiana properties that Titus Sr. and Valerie had transferred to Stelzer were sold on June 30, 2014. A portion of the proceeds was used to pay court-ordered restitution of $925,320; another portion was used to pay Titus Sr.'s attorney's fees; and the balance of $757,299.99 was paid to Stelzer.

¶9.	Shortly after Titus Sr. went to prison, he and Valerie divorced. After his release, Titus Sr., individually and personally, conveyed part of the forty-acre tract at issue to Benen LLC on June 22, 2017.[3] On April 14, 2021, in a separate deed, Titus Sr. conveyed the full forty acres to his five children using the authority he had as Stelzer's power of attorney. The deed identified the grantor as "Joan Gail Stelzer, acting by and through my Mandatary (attorney-

---

[3] There is no information in the record concerning the ownership or membership of Benen LLC.

4

in-fact or representative), Mark J. Titus." Titus Sr. never informed Stelzer about these conveyances, and she only discovered them when she attempted to sell the property. On October 13, 2021, Samantha conveyed any interest she had in the property to Stelzer, and Luke did the same by a deed executed on October 22, 2021.

*Chancery Court Proceedings*

¶10.    On December 7, 2021, Stelzer filed suit in the Pearl River County Chancery Court to quiet her title to the forty acres. Stelzer named as defendants Titus Sr., Titus Jr., Jessica, Eric, and Benen LLC. Stelzer alleged that the conveyance to Benen LLC which Titus Sr. signed, personally, was void because he, personally, did not own the property at the time. Stelzer further alleged that the power of attorney she signed did not authorize Titus Sr. to convey the property to all of his children.

¶11.    The defendants filed an answer, affirmative defenses, and a counterclaim on January 6, 2022. They pleaded (1) that Stelzer had failed to join Samantha and Luke who were necessary and indispensable parties to the suit, (2) that Stelzer paid nothing for the property and thus she was not damaged by Titus Sr.'s conveyances, and (3) that Stelzer had not properly revoked the power of attorney she gave to Titus Sr. The defendants also counterclaimed for sanctions under the Mississippi Litigation Accountability Act (Mississippi Code Annotated section 11-55-1 (Rev. 2019)) and Rule 11 of the Mississippi Rules of Civil Procedure.[4] On that same day, the defendants filed a separate motion to

---

[4] Rule 11(b) provides:

If a pleading or motion is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false, and the action may

5

dismiss the complaint for failure to join Samantha and Luke.  On January 10, 2021, Stelzer

responded to the motion to dismiss, pointing out that Samantha and Luke had conveyed their

interest in the property to Stelzer prior to the date of filing and that they, therefore, were not

necessary parties to the suit.

*Temporary Hearing*

¶12.   The chancery court held a hearing on Stelzer's request for temporary relief on

February 15, 2022.  During the hearing, the chancery court examined Titus Sr.'s June 22,

2017 deed to Benen LLC and determined that it was void because it was signed by Titus Sr.,

individually, not as Stelzer's attorney-in-fact.  The court found that at the time, the property

was still titled in Stelzer's name.  The court stated it did not have to wait for the trial and

"[t]hat instrument deed from Titus to Benen executed in 2017 needs to be set aside, so that's

out."

¶13.   The chancery court heard testimony that trees had been cut and that other construction

was being undertaken on the land.[5]  The attorneys also provided the court with a copy of the

2002 Mississippi chancery court order that vested Sylvia's interest in the property to Titus

---

proceed as though the pleading or motion had not been served. For wilful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted. If any party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay, the court may order such a party, or his attorney, or both, to pay to the opposing party or parties the reasonable expenses incurred by such other parties and by their attorneys, including reasonable attorneys' fees.

[5]   Testimony of the three witnesses (Stelzer, Valerie, and Titus Sr.) from the temporary hearing will be included in more detail in our analysis section.

Sr. The court confirmed with Mark that the "Sylvia Ann Piquine" mentioned in the document was Titus Sr.'s first wife. Titus Sr. said they divorced and the court gave him the Mississippi property, but Sylvia refused to sign it over to him. In that 2002 proceeding, the chancery court confirmed title to the Mississippi property in Titus Sr.'s name only.

¶14. At the close of testimony, Titus Sr.'s attorney brought up the motion to dismiss that he had filed because Samantha and Luke were not joined as parties. Samantha was in the courtroom, and the chancellor asked her if she had deeded the property to her grandmother, Stelzer, in order not to be involved in this litigation. Samantha answered in the affirmative and added that it was her understanding that when Stelzer passed away, the property would go only to Samantha and her brother Luke.

¶15. The chancery court ultimately enjoined all parties from cutting timber on the property and ordered that they take no further action that would devalue the property. However, the court granted all parties access to the property. On February 22, 2022, the court entered a written order on pending motions, including these rulings. The court denied the motion to dismiss for failure to join necessary parties and set aside Titus Sr.'s June 22, 2017 deed to Benen LLC.

*Motion to Amend Answer*

¶16. On April 21, 2022, the Tituses filed a motion to amend their answer to add an additional affirmative defense that Titus Sr.'s conveyance of the forty acres to Stelzer on July 8, 2011, created a resulting trust. On that same day, the chancery clerk issued a notice setting the matter for trial on August 30, 2022. The Tituses failed to set their motion to amend for

7

a hearing and Stelzer did not respond to it until August 24, 2022. In her response, Stelzer argued that a resulting trust is not an affirmative defense but, instead, a counterclaim that was barred by the ten-year statute of limitations found in Mississippi Code Annotated section 15-1-7 (Rev. 2019).[6] She pointed out that the property was conveyed on July 8, 2011, but the counterclaim for a resulting trust was not raised until April 21, 2022. In the alternative, Stelzer argued that if the resulting-trust claim were deemed an affirmative defense, the Tituses waived it by failing to plead it and then actively participating in the proceedings.

¶17. In an order signed on August 25, 2022, the chancery court denied the defendant's motion to allow the additional defense. The court found that the defendants had failed to raise this affirmative defense in their original answer, and therefore the defense was waived. Moreover, the court determined that if it allowed the additional affirmative defense five days prior to trial, the proceedings would be unduly delayed.

¶18. However, at the beginning of the trial, the chancery court revisited the issue of the Tituses' claim of a resulting trust. Although the court felt that a resulting trust would have been a counterclaim, the court stated it "would allow everybody their full day in court" and ruled that it would allow anyone to offer any evidence they had regarding a resulting trust. That said, both parties announced they were ready to proceed.

*Relevant Fact Testimony of Witnesses from the Temporary Hearing and Trial*

¶19. The trial on the matter commenced on August 30, 2022, and the following is a

---

[6] "A person may not make an entry or commence an action to recover land except within ten years next after the time at which the right to make the entry or to bring the action shall have first accrued to some person through whom he claims . . . ." Miss. Code Ann. § 15-1-7.

summary of the relevant fact testimony of the three witnesses including Stelzer, Valerie, and Titus Sr., elicited at both the temporary hearing and trial.

*Stelzer*

¶20. Stelzer testified that Titus Sr. deeded the Mississippi property to her in 2011 to make sure that his wife Valerie and his two children by her were financially secure if he were to go to prison. She stated:

> The understanding was if he did go to prison and we due to the fact that we would have no place to live or we needed money, then I had the authority from Mark to go ahead sell the property, to do whatever I need to do to take care of supporting, taking care of us, his wife and the two children.

She admitted that she never paid Titus Sr. anything for the property except a nominal payment of $10 or $20. But she said there was no agreement that when he got out of prison that she would give him the property back.

¶21. Stelzer also testified that she executed her will on July 18, 2011, ten days after Titus Sr. transferred the property to her. She said that in the will, she bequeathed the Mississippi property only to her grandchildren Samantha and Luke. She said Valerie and Titus Sr. were present in the room when she executed this will, and Titus Sr. was aware of the provision and made no objection to it.

¶22. Stelzer further testified that she executed the power of attorney so that Titus Sr., who traveled a lot at the time, could go to Chicago to see about assisting Stelzer's sister in accessing a home they had inherited from their aunt. Their aunt's partner would not let her sister into the house. Stelzer asked Titus Sr. to step in, and he suggested the power of attorney. Stelzer said the only reason for the power of attorney was for Titus Sr. to deal with

9

the issues surrounding her deceased aunt's estate in Chicago. She said that Titus Sr. suggested the power of attorney so there would be no question of his authority when he was in Chicago. Stelzer said Titus Sr. did in fact act on her behalf in that matter.

¶23. Stelzer testified that Valerie was in substantial debt because Titus Sr. had reneged on his promise to repay her for what she spent on expenses for his attorneys and the criminal case. When asked about the proceeds of the sale of the Louisiana properties and the $757,229.00 she admitted she received, Stelzer testified:

Q.    What did you do with the check?

A.    (Gesturing.) What, to -- to pay off a lot of Mark's attorneys that were not all listed there, but there were other attorneys and it was to complete the building of a house that we were going to live in then.

Q.    Okay. Who is "we"?

A.    My daughter Valerie Titus and my grandchildren, Samantha and Luke Titus.

Q.    So some of this $700,000 was used to purchase a home; correct?

A.    It wasn't to purchase a home. It was to complete repairs on it.

Stelzer said that she filed the lawsuit because she now wanted to sell the property to pay her daughter's bills and that her daughter had a potential buyer for the property.

¶24. Stelzer also said that in 2017 she revoked the 2011 power of attorney that she had signed. She said that because her Chicago issue had long-since resolved, she went to a notary public on July 22, 2017, and signed a revocation of the power of attorney. But she said she did not know where the actual document was because her daughter had put it in a

box that was placed in a locked container located on the property. Stelzer accused Titus Sr. of going onto the property and cutting all the locks off the containers. The box with the revocation in it is now missing. Stelzer admitted that she never personally told Titus that she had revoked the power of attorney, but she said her daughter had told Titus Sr.

¶25. Stelzer confirmed for the court that Titus Sr. never contacted her in 2021 before he used her power of attorney to convey the property to his five children. She did not agree to this conveyance, and she said that the deed was contrary to the terms of her will (of which Titus Sr. was aware).

*Valerie*

¶26. Stelzer's daughter and Titus Sr.'s ex-wife Valerie was asked why Titus Sr. put the property in Stelzer's name in the first place. Valerie replied that although the government was not going after any property in a forfeiture proceeding, Titus wanted the property to be in a position where Stelzer could sell it or have it for Valerie and her two children to live on. Valerie testified that she believed Titus Sr. left his other three children out because he was estranged from them. She said Titus Sr. and his eldest son had had a disagreement and had not spoken to each other for over two years. His other children were older and had their own homes and families. Conversely, Valerie said her children were nine and seven years old at the time of Titus Sr.'s conveyance of the Mississippi property to Stelzer in 2011.

¶27. Valerie confirmed that Titus Sr. was present when Stelzer executed her will on July 18, 2011. The purpose of the will, she said, was to bequeath the Mississippi property to her two children, Samantha and Luke, because if Stelzer passed away, Valerie did not want it to

11

be an issue with her brother and sisters.

¶28. Valerie testified that there were two criminal cases against Titus Sr.—one for mail fraud and one for tax evasion. The second case was dismissed. Until Titus Sr. was sentenced for mail fraud, she was told there would be no forfeitures sought. Titus Sr. initially told her he anticipated getting a slap on the wrist. However, after he went to prison, the government indicated that it was going after all their properties, and it was Valerie who made the deal with the government to sell some property to keep the government from seizing everything.[7] She found a purchaser for the New Orleans properties who would pay fifty cents on the dollar. They sold four Louisiana properties—three titled in her and Titus Sr.'s name and one in Stelzer's name—and used the first $925,000 to pay the restitution, fines, and court costs that Titus Sr. owed. The rest of the proceeds from the sale was used to pay off the mortgage on the house, pay off taxes, and pay $500,000 toward the attorney's fees. About $300,000 went to finding a house to renovate and live in.

¶29. Valerie testified she and Titus Sr. divorced in 2013, but the separation agreement concerning marital assets was not finalized until January 2021. At that time, Titus Sr. pressed her to get Stelzer to deed the Mississippi property to all five of his children. Valerie said she told him that Stelzer did not agree to do that, and the property was not hers (Valerie's) to negotiate. Valerie testified that she put all documents dealing with the separation in the container on the Mississippi property, along with Stelzer's revocation of the

---

[7] Valerie's testimony is supported by the settlement sheet for the sale of the New Orleans properties, dated June 30, 2014, which was after Titus Sr. began serving his sentence.

12

power of attorney. On cross-examination, she added that she had two copies of everything. She kept one copy at the house in New Orleans, and she had another copy in the container in Mississippi. But when he was released from prison, Titus Sr. came to the house to visit the children and she later discovered several important papers missing. She then learned of the break-in of the containers in Mississippi. Valerie testified that she was present when Stelzer signed the revocation at the notary's office in New Orleans. She and Stelzer did not know they had to send Titus Sr. a copy but she said she told Titus Sr. that Stelzer had revoked the power of attorney when they spoke about Valerie's discovery that the locks on the container had been broken.

¶30. Valerie stated that she still had over $100,000 in debt from Titus Sr.'s criminal proceedings and that Titus Sr. had promised to pay her back for these expenses, but he did not pay her back.[8] So she found a buyer who offered to buy the property for $220,000. Valerie and Stelzer only learned that Titus Sr. had in fact deeded the property to his children when they started trying to sell the property themselves. A neighbor called her and told her about the activity on the land. Valerie went to the property, and that is when Titus Sr. presented her with a copy of the deed.

¶31. Valerie admitted that she had reported Titus Sr. to the Mississippi State Board of Public Contractors for allegedly falsifying his application to renew his contractor's license. She said she did this because Titus Sr. owed her $167,000 in back child support.

---

[8] Stelzer testified that she was 100% liable for Titus Sr.'s attorney's fees and paid them all. Some of the fees were for the criminal proceedings, and some were for the forfeiture. She said Titus directed her to different attorneys, and she spent $500,000 fighting the forfeiture proceedings.

*Titus Sr.*

¶32.	Titus Sr. explained how he had acquired the Mississippi property and how he had conveyed it to Stelzer when the federal government first said that it was not seeking any forfeiture. Titus Sr. testified that when he transferred the properties (Louisiana and Mississippi), he and Stelzer had an understanding that all would be used to benefit the whole family, including all five children. The government changed prosecutors and the new ones demanded forfeiture which led to the sale of the New Orleans properties.

¶33.	Titus Sr. was aware of Stelzer's will, and he testified that when she signed it on July 18, 2011, they disagreed about her leaving the Mississippi property to only Samantha and Luke. But Titus Sr. did not object at the time. He reasoned that at least the will would ensure that Stelzer's other children would not get any interest in it. He felt that if Stelzer died, Samantha and Luke could work things out with Titus Sr.'s other children.

¶34.	Later in December 2011, Titus Sr. said that Stelzer had spoken to him about matters concerning her sister's affairs in Chicago. He had originally drafted up a power of attorney that limited his authority to financial and banking issues that pertained to that matter specifically. But when they went to the notary's office, the officials would not notarize a document that they had not prepared. The notaries had two power-of-attorney forms: one that included end-of-life decision-making authority and one that did not. Stelzer chose the former form. Titus Sr. also testified that he had been handling Stelzer's affairs before the power of attorney was signed and that the power of attorney gave him the authority to act on her behalf in real estate matters. He said that Stelzer knew he was unhappy about the way

14

that she had structured her will, but she said:

> Look, with this authority, you can take care of any business the way you need to as you see best. Mark, I'm trusting you with my life. I'm assuming that you are going to do what is in the best interest all the way around.

Titus Sr. contended that Stelzer wanted his intentions to be done when she executed the power of attorney and thus he actually acted in conformity with her wishes when he executed the 2021 deed to all five of his children.

¶35. Titus Sr. testified that although he and Valerie divorced, she and the children visited him in prison and Titus Sr. believed that on his release he would return home and live with them again. However, after his release, he learned she had remarried. Titus Sr. testified that Stelzer did not inform him that she had revoked the power of attorney and Valerie only mentioned it during the current legal proceeding. He denied going into the storage container on the property and taking any documents.

*Court's Ruling*

¶36. After both parties had presented their evidence, the chancery court took the matter under advisement.[9] On September 12, 2022, the court rendered its opinion and final judgment, which was filed by the clerk on September 21, 2022. In it, the court reviewed the pleadings, the proceedings, and trial testimony. The court noted that after the New Orleans properties were sold, Stelzer received $757,229.99. Stelzer testified that a substantial portion

---

[9] During the trial, the court noted that the parties had not entered the deeds to the Louisiana properties. After the hearing, on September 8, 2022, Titus Sr. moved to reopen the case and enter those deeds, which he attached as exhibits. The chancery court made no specific ruling on the post-hearing motion but noted in the final judgment that its review of those exhibits did not change the court's findings.

15

was used to pay attorney's fees to fight the forfeiture and that she realized only $300,000 of profit, which was used to purchase a home for herself, Valerie, and two of Titus Sr.'s children. The court noted that Titus Sr. never filed an action to establish a resulting trust in those funds, which the court found supported Stelzer's position that the property was deeded to her to care for Titus Sr.'s wife and children if Titus Sr. were incarcerated. Moreover, Titus Sr.'s attempt to convey the property to Benen LLC contradicted his position that the property was to be held in trust for all the children. Implicitly rejecting the Tituses' argument that the Mississippi property that Stelzer owned was, in fact, a resulting trust, the court held that Titus Sr.'s April 14, 2021 deed of the property to the five children was null and void. The court certified the order as a final order pursuant to Mississippi Rule of Civil Procedure 54(b).

¶37. On October 12, 2022, the Tituses appealed. They raise the following issues: (1) whether Titus Sr.'s conveyance of the Mississippi property to Stelzer created a resulting trust with Stelzer holding legal title for the benefit of all of Stelzer's children; (2) whether Stelzer violated her fiduciary duty as a trustee for Titus Sr. and/or his five children when she intended to sell the forty acres and give the proceeds to Valerie; (3) whether the power of attorney created any fiduciary obligation on Titus Sr. with respect to the forty acres if the original conveyance created a resulting trust; (4) whether the chancery court erred by denying the Tituses' motion to dismiss for Stelzer's failure to join Samantha and Luke as necessary parties; and (5) whether the court erred by denying the Tituses' motion to reopen the record to allow the deeds to the properties in New Orleans to be submitted after trial.[10]

---

[10] For purposes of this discussion, several of these issues are dealt with in a single section. In addition, because the chancery court did review the additional documents that

16

¶38. It is well established that "a chancellor's findings of fact will not be reversed unless the chancellor abused his discretion, manifestly or clearly erred, or applied an erroneous legal standard." *Est. of Rogers v. Est. of Rogers*, 366 So. 3d 911, 920 (¶27) (Miss. Ct. App. 2023) (citing *Wayne Cnty. Sch. Dist. v. Quitman Sch. Dist.*, 346 So. 3d 853, 857 (¶15) (Miss. 2022)). "However, we review issues of law de novo." *Id*.

¶39. Concerning the joinder of necessary parties, a chancery court's application of Rule 19 of the Mississippi Rules of Civil Procedure is a matter of law and subject to de novo review. *Pope v. Fountain*, 287 So. 3d 988, 993 (¶18) (Miss. Ct. App. 2019) (citing *Williams v. Williams*, 264 So. 3d 722, 725 (¶5) (Miss. 2019)).

**Discussion**

I. **Whether the chancery court erred by denying the Tituses' motion to dismiss because Stelzer failed to join Samantha and Luke as necessary parties.**

¶40. The Tituses contend that Stelzer's two grandchildren Samantha and Luke had an interest in the proceedings that required their joinder as necessary parties under Rule 19. They claim that the chancery court erred by not dismissing Stelzer's case when these allegedly necessary parties were not joined.

¶41. Rule 19(a) of the Mississippi Rules of Civil Procedure provides:

> A person who is subject to the jurisdiction of the court shall be joined as a party in the action if:

Titus Sr. attached to his motion to reopen the record, we find no merit to the issue of the court's alleged denial of his motion.

(1) in his absence complete relief cannot be accorded among those already parties, or
(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

"A necessary party is one who has such a substantial interest in the suit that no complete, practical, and final judgment can be made without directly affecting his interest or else leaving the controversy in such condition that its final determination may be wholly inconsistent with equity and good conscience." *Est. of Stephens v. Est. of Palmer*, 324 So. 3d 1175, 1178 (¶14) (Miss. Ct. App. 2021) (internal quotations marks omitted).

¶42. The Comment to Rule 19 states:

There is no precise formula for determining whether a particular nonparty must be joined under Rule 19(b). The decision has to be made in terms of the general policies of avoiding multiple litigation, providing the parties with complete and effective relief in a single action, and protecting the absent persons from the possible prejudicial effect of deciding the case without them.

In *Stephens*, 324 So. 3d at 1175-77 (¶2), we affirmed a chancery court's decision and held that a trustee named in a deed of trust is a necessary party in a suit to set aside the foreclosure sale because the suit challenged the actions of the trustee who conducted the foreclosure. We stated that "Dreyfus was the trustee at the time of the foreclosure, and it is his actions that the Stephens Estate challenges; thus, he is indeed a necessary party. The chancellor was correct to find that in this situation the trustee is a necessary party." *Id.* at 1180 (¶20). However, we have also held that a wife who had been a co-owner of a contracting business was not a necessary party in a breach of contract action because she was no longer involved

18

in the business when the breach occurred. *Gecko Outdoor Prods. Corp. v. Casablanca Constr. Inc.*, 250 So. 3d 508, 512 (¶12) (Miss. Ct. App. 2018). Thus, the trial court did not err in denying a motion to dismiss for failure to join the wife as a necessary party. *Id.*

¶43. In this case, the Tituses cite no authority other than Rule 19 itself to support their position that Samantha and Luke were necessary parties. However, the record is clear and undisputed that both Samantha and Luke had quitclaimed any interest in the property to Stelzer prior to the filing of the suit. Samantha told the court that she had voluntarily deeded her interest because she did not want to be a party to the suit. Thus, neither she nor Luke had any legal interest in the property that needed to be protected and they were not necessary parties.[11]

¶44. The Tituses argue that if the chancery court had found that the original 2011 conveyance from Titus Sr. to Stelzer created a resulting trust on behalf of all five of Titus Sr.'s children, then Luke and Samantha did have an interest that needed to be protected. But they both deeded any interest they had to Stelzer prior to the lawsuit. In the event that the original conveyance to Stelzer was determined to be a resulting trust, Stelzer herself was in a position to protect their interest. Thus, any interest that Samantha and Luke may have had in the property with or without a finding of a resulting trust was still adequately protected.

---

[11] Compare these facts to those in *Powell v. Evans*, 113 So. 3d 1270 (Miss. Ct. App. 2013). There, a mother deeded her daughter a piece of the property in dispute. *Id*. at 1274 (¶20). Clearly, because the daughter had an "undeniable interest" in the litigation, distinct from her mother's, we held that the daughter was a necessary party. *Id*. at 1275 (¶23). In this case, the opposite occurred. Samantha and Luke deeded their interest in the property to their mother prior to the litigation, and as a result, they had no interest in it requiring their joinder.

19

Therefore, we find no error by the chancery court in finding them not to be necessary parties and denying the Tituses' motion to dismiss on that basis.

> **II.** **Whether the chancery court erred by finding that Titus Sr.'s July 8, 2011 conveyance of the property to Stelzer did not create a resulting trust.**

¶45. "Mississippi recognizes two types of trusts: (1) express trusts and (2) implied trusts." Ronald C. Morton, *Trusts*, 8 Jeffrey Jackson et al, *Encyclopedia of Mississippi Law* § 73:1 et al., at 404 (2d ed. updated Oct. 2022). In an express trust, a party intends to create the trust; an implied trust is "equitably established by implication of law or presumed from specific circumstances." *Id*.

¶46. There are two kinds of implied trusts: (1) constructive trusts and (2) resulting trusts. *Id*.; *Presbytery of St. Andrew v. First Presbyterian Church PCUSA of Starkville*, 240 So. 3d 399, 405 (¶26) (Miss. 2018). When a court finds sufficient evidence to support an implied trust, the court imposes "an equitable trust on the bare legal title to the property in order to protect the interest of that person actually entitled to the benefits of ownership of the property." *Ainsworth v. Plunk*, 343 So. 3d 1108, 1113 (¶17) (Miss. Ct. App. 2022) (quoting *Simmons v. Simmons*, 724 So. 2d 1054, 1057 (¶6) (Miss. Ct. App. 1998)).

> The primary difference between [a constructive trust and a resulting trust] is that "in a resulting trust, the acquisition is mutually agreeable, and the inequity arises out of the trustee's subsequent unwillingness to honor the terms of the parties' original agreement"; whereas a constructive trust may be imposed when "acquisition of title is somehow wrongful as to the purported beneficiary."

*Smiley v. Yllander*, 105 So. 3d 1171, 1176 (¶12) (Miss. Ct. App. 2012) (quoting *Simmons*, 724 So. 2d at 1057 (¶7)).

¶47.    "A resulting trust is designed to give effect to the unwritten but actual intention of the parties at the time of the acquisition of title to the affected property." *Id*. at 1175 (¶12) (internal quotation marks omitted).

> Broadly speaking, a resulting trust arises from the nature or circumstances of consideration involved in a transaction whereby one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another.

*In re Est. of Abernathy*, 778 So. 2d 123, 127-28 (¶18) (Miss. 2001) (quoting *Church of God Pentecostal Inc. v. Freewill Pentecostal Church of God Inc.*, 716 So. 2d 200, 207 (¶22) (Miss. 1998)).  Because it is an "intention-enforcing trust," a resulting trust seeks to give effect to the actual intention of a party, even if it is not directly expressed.  *Id*. at 128 (¶18). For example, in *Presbytery of St. Andrew*, the Mississippi Supreme Court found no evidence that the local Presbyterian church intended to create a trust in favor of the national church in the property that the local church held.  *Presbytery of St. Andrew*, 240 So. 3d at 406 (¶28).

¶48.    A person claiming that either type of implied trust exists has the burden of proving the elements of those trusts by clear and convincing evidence.  *In re Ests. of Gates*, 876 So. 2d 1059, 1064 (¶13) (Miss. Ct. App. 2004) (citing *Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985)).  This burden has been described as an "imposing" one and requires proof beyond a mere preponderance of the evidence.  *Simmons*, 724 So. 2d at 1058 (¶12).

¶49.    In this case, the Tituses contend that Titus Sr. conveyed the Mississippi property in trust for the benefit of all five of his children.  But Stelzer testified that it was unconditionally conveyed to her because Titus Sr. might be incarcerated, and his wife Valerie and his two minor children living with her had no support.  Stelzer also points out that when she prepared

her will, she left the property only to Samantha and Luke. Titus Sr., who was present when she executed the will, was aware of this provision and voiced no objection. Although he testified at trial that he opposed Stelzer's will provision, he agreed he did not say anything at the time. Titus Sr.'s failure to object to the will's provision concerning the property supports Stelzer's testimony that the parties intended that the property be conveyed to her for her to use at her discretion to support Titus Sr.'s wife and minor children if needed. In addition, Valerie testified that at the time of the conveyance, Titus Sr.'s other children were grown and had their own families. She said one of his other children was actually estranged from Titus Sr. at the time. Valerie further testified that in 2021, when they were discussing the property settlement portion of their divorce, Titus Sr. asked her to ask Stelzer to deed the property to all five of his children. This shows that Titus Sr. knew that Stelzer held the property unconditionally and that for his five children to get it, she would need to deed it to them. On the other hand, Titus Sr. presented no evidence, other than his own testimony, to prove his allegation that the conveyance was intended to benefit all five of his children.

¶50. We note, as did the chancery court, that Titus Sr. also conveyed Louisiana properties to Stelzer as well. After Titus Sr. was incarcerated, those properties were sold to pay the restitution he owed and part of his attorney's fees; the balance was paid to Stelzer who used it to provide a home for Valerie and the children. But upon his release in 2017, Titus Sr. took no steps to seek recovery of the balance of those sale proceeds either for himself or for all of his children. That Titus Sr. clearly did not convey those properties to Stelzer to be held in trust evidences an intent to convey all his properties, including the Mississippi property,

22

to Stelzer to use at her discretion. Moreover, as noted by the chancery court, four years after his release, Titus Sr. deeded the property to Benen LLC. Conveying the property to this limited liability company contradicts Titus Sr.'s testimony that the property was to be held in trust for his five children.

¶51. Since there was no jury, the chancellor was the finder of fact, so she was responsible for assessing the credibility of the witnesses and determining the weight of the evidence. *Simmons*, 724 So. 2d at 1059 (¶16). "It is not within the prerogative of an appellate court to re-weigh the evidence and reach an independent decision. . . . Rather, on appeal, our authority is limited to interceding only to correct what we consider to be a manifest error in the chancellor's decision on the facts." *Id*. Accordingly, after a review of the evidence, we find the chancellor did not err in concluding that the Tituses had not presented clear and convincing evidence to establish their claim of a resulting trust. Therefore, we find no error with the chancery court's findings and judgment that the 2011 conveyance of the Mississippi property to Stelzer did not create a resulting trust for Titus Sr.'s five children and that the April 14, 2021 deed should be set aside.[12]

### III. Whether Titus Sr. had the authority under Stelzer's power of attorney to convey the property to his five children.

¶52. The chancery court voided the 2021 deed that Titus Sr. signed conveying the property to his five children. Because we have affirmed the chancery court's ruling that there was no resulting trust, the title remained in Stelzer's name after its conveyance to her in 2011. The

---

[12] Because we agree that the Tituses failed to present clear and convincing evidence of a resulting trust, we need not deal with their issue charging Stelzer with breaching any claimed fiduciary duty she may have owed them.

Tituses contend, however, that the power of attorney Stelzer signed in December 2011 gave Titus Sr. the authority to handle any of her affairs, including Titus Sr.'s 2021 transfer of the Mississippi property she owned. The chancery court disagreed and voided the 2021 deed that Titus Sr. had signed.

¶53. Mississippi Code Annotated section 87-3-7 (Supp. 2017) outlines the authority of one acting under a power of attorney:

> (1) A letter of attorney to transact any business need only express plainly the authority conferred.
>
> (2) If any power of attorney or other writing (a) authorizes an attorney-in-fact or other agent to do, execute or perform any act that the principal might or could do, or (b) evidences the principal's intent to give the attorney-in-fact or agent full power to handle the principal's affairs or deal with the principal's property, the attorney-in-fact or agent shall have the power and authority to make gifts in any amount of any of the principal's property to any individuals or to any organizations described in Sections 170(c) and 2522(a) of the Internal Revenue Code or corresponding future provisions of federal tax law, or both, in accordance with the principal's personal history of making or joining in the making of lifetime gifts, including the authority to exercise all rights and powers granted to a fiduciary under the Revised Uniform Fiduciary Access to Digital Assets Act created under Chapter 23, Title 91.
>
> (3) Subsection (2) as set forth above is declaratory of past and present law in the State of Mississippi, and shall be applied to all powers of attorney, whether executed before, on or after March 16, 1999.

¶54. "A [power of attorney] 'is nothing more than one form of a principal-agency relationship.'" *In re Est. of Hemphill*, 186 So. 3d 920, 933 (¶49) (Miss. Ct. App. 2016) (quoting *Clark v. Ritchey*, 759 So. 2d 516, 518 (¶7) (Miss. Ct. App. 2000)). In *McKinney v. King*, 498 So. 2d 387, 388 (Miss. 1986), the Mississippi Supreme Court noted the fiduciary duty owed by the agent to the principal under a power of attorney. In that case the husband

24

had signed a power of attorney appointing his wife as his attorney-in-fact. *Id.* The husband also executed a will in favor of his wife and daughter. *Id.* Without notice to the husband or his consent, the wife used the power of attorney to deed the property they held as tenants in common to now have it held by herself and her husband with rights of survivorship. *Id.* The Mississippi Supreme Court set aside the wife's deed and stated:

> It is fundamental law that an agent owes his principal absolute good faith and fidelity, and he cannot in the exercise of his authority as agent acquire property or interest therein rightfully belonging to his principal without full disclosure and free consent of his principal. Any property or interest obtained thereby is voidable by, and may be set aside by the principal or his estate.

*Id.*

¶55. The Mississippi Supreme Court cited *McKinney* when the attorney-in-fact used a power of attorney to change the names of beneficiaries on the certificates of deposit owned by the principal in *In re Matter of Estate of Johnson v. Johnson*, 237 So. 3d 698, 710 (¶2) (Miss. 2017). The supreme court made it very clear that although a power of attorney authorizes the attorney-in-fact to sign documents, "this broad authority does not permit the attorney-in-fact to engage in undisclosed, self-dealing activities." *Id.* at 707 (¶23). The supreme court stated:

> If disputed, the attorney-in-fact's actions must be shown to be within the principal's intent when granting the power of attorney, in the best interests and for the benefit of the principal, and in accord with the duty of good faith owed by the attorney-in-fact to the principal. Any property or interest obtained in violation of the attorney-in-fact's fiduciary duty thereby is voidable by, and may be set aside by the principal or his estate.

*Id.* (internal quotation marks omitted).

¶56. Applying these principles to the facts before us, the record shows that Stelzer executed

a power of attorney in December 2011 that named Titus Sr. as her attorney-in-fact. As her attorney-in-fact, Titus Sr. owed Stelzer a fiduciary duty to act in her best interests. As of 2021, Stelzer owned the Mississippi property in question, and we have affirmed the chancery court's ruling that it was not held in trust.[13] Thus, Stelzer owned the property, and she owed no fiduciary duty to Titus Sr.'s children. Under the power of attorney, it was Titus Sr. who owed a duty to her. Stelzer testified that her intent was to sell the property to help her daughter pay bills that Titus Sr. had left her unable to pay. Moreover, she never intended that all five of Titus Sr.'s children benefit from the property; if anything, in her will she left the property to only two of them. Titus Sr. did not consult her or obtain her consent to convey the property, and his use of Stelzer's power of attorney to do so constituted a breach of the fiduciary duty he owed Stelzer.

¶57. Further, Titus Sr. presented no proof, other than his own testimony, to support his rationale for this obvious breach of his fiduciary duty under the power of attorney. Titus Sr. contends that Stelzer always desired for all of Titus Sr.'s children to have the property and that he was only effecting her desire in his 2021 deed. But Titus Sr. presented no supporting evidence that this was her desire. Moreover, if this was in fact Stelzer's desire, why did Titus Sr. keep the deed secret, transferring the property with no notice to her and without her consent? In no way imaginable did Titus Sr.'s conveyance of the property to his five children benefit Stelzer.

¶58. Accordingly, after thoroughly reviewing the record, we find that Titus Sr. did not have

---

[13] The Tituses argue that because Stelzer was conveyed the Mississippi property in trust, it was she who owed them a fiduciary duty.

the authority to execute the 2021 deed to his five children using Stelzer's power of attorney, and we affirm the chancery court's judgment setting that deed aside.

## Conclusion

¶59.    We affirm the chancery court's judgment setting aside Titus Sr.'s April 14, 2021 deed to his five children.  Titus Sr.'s original conveyance of the property to Stelzer did not create a resulting trust on the children's behalf, and Titus Sr. did not have the authority under Stelzer's power of attorney to convey the property.

¶60.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**